PeR Curiam:
This case was referred to Trial Commissioner Mastín G. White, with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on *1039 February 7, 1966. Exceptions to the commissioner’s opinion and findings were filed by plaintiffs. Defendant requested that the court adopt the commissioner’s report, opinion and recommended conclusion of law. The parties have filed briefs and the case has been argued orally. Since the court is in agreement with the opinion and recommendation of the commissioner, with modifications, it hereby adopts the same, as modified, as the basis for its judgment in this case, as hereinafter set forth. Plaintiffs are, therefore, not entitled to recover and their petition is dismissed.
Commissioner White’s opinion,* as modified by the court, is as follows:
The plaintiffs remaining in this case, A. Kertzman Dredging Company, Midwest Dredging Company, and James F. Richards Construction Company, are three companies which acted as joint venturers under the name of Richards & Associates in performing a contract (No. D A — 4-1-243-CI VENG-60-124) with the Army Corps of Engineers for the construction of jetties extending into the Gulf of Mexico from Padre Island in the vicinity of Port Mansfield, Texas.[1]
While the jetties were in the process of being constructed and were approximately 80 percent complete, the Gulf Coast of Texas was struck by hurricane Carla in September 1961. Large waves generated by the hurricane did a substantial amount of damage to the jetties project, requiring much clean-up and repair work at great additional expense to restore the project to the condition in which it had been immediately prior to the hurricane. The present action is for the recovery of the additional expenses that were incurred in connection with such clean-up and repair work.
It is my opinion that the plaintiffs are not entitled to recover.

The Basic Facts

Port Mansfield, Texas, is located in Willacy County on the Gulf Coast of Texas, approximately 93 miles south of Corpus *1040 Cbristi and approximately 38 miles north, of Port Isabel. It is situated on the west shore of Laguna Madre, a lagoon about 115 miles long that is separated from the Gulf of Mexico by Padre Island. The Gulf Intracoastal Waterway runs through the length of Laguna Madre. Padre Island, at the point nearest to Port Mansfield, lies about 9 miles across Laguna Madre. It consists of an offshore sand-bar formation which varies from y2 mile to 2 miles in width and from 2 feet to 16 feet in elevation.
Prior to 1960, local interests had expended substantial sums of money in navigation improvements that provided (among other things) a channel from Port Mansfield eastward to the Gulf of Mexico, across Laguna Madre and through Padre Island. The Gulf end of this channel was flanked, on the north and on the south, by two concrete tetrapod jetties, which had been built by the Willacy County Navigation District. However, these tetrapod jetties had settled below the surface of the Gulf by 1960, and new jetties were required for the adequate protection and maintenance of the channel.
In April 1960, the U.S. Army Engineer District at Galveston, Texas (which will usually be referred to hereafter in the opinion as “the District”), issued an invitation for bids on a proposed contract for the construction of stone jetties to replace those previously mentioned. The proposed contract provided (among other things) that the contractor would be compensated for the blanket material, the core stone, the filler stone, and the cover stone used in constructing the jetties pursuant to the plans and specifications of the contract, such compensation to be computed on the basis of unit per-ton prices for the various classifications of stone as agreed to by the parties in the competitive bidding procedure.
The James F. Richards Construction Company, of Minneapolis, Minnesota, received a copy of the invitation for bids mentioned in the preceding paragraph. James F. Richards, head of that company, visited the site of the proposed jetties project on May 3 or 4, 1960. Subsequently, on or about May 18, 1960, Mr. Richards again visited the project site, accompanied by representatives of two other companies, the *1041 A. Kertzman Dredging Company and the Midwest Dredging Company.
After investigating the project site and local conditions, Mr. Richards prepared a bid for the proposed contract on behalf of the James F. Richards Construction Company, the A. Kertzman Dredging Company, and the Midwest Dredging Company, the three companies acting as joint venturers and using the name of Richards & Associates. Mr. Richards went to Galveston and submitted the bid to the District on May 24,1960.
When the bids which had been submitted in response to the invitation were opened by the District on May 24, 1960, it was determined by the contracting officer that the joint venture previously mentioned was the lowest responsible bidder. Accordingly, the contract was awarded to the joint venture. (For the sake of convenience, the three companies comprising the joint venture will usually be referred to collectively hereafter in the opinion as “Richards & Associates” or as “the contractor.”)
On or about June 6,1960, a contract was signed by a contracting officer of the Corps of Engineers on behalf of the defendant and by Richards & Associates as the contractor for the construction of the jetties near Port Mansfield. A construction period of 750 days was provided for in the contract. The total amount of the contract, on the basis of the unit prices and estimated quantities set out in the contract, was $2,493,860. (This contract will usually be referred to hereafter in the opinion as “the contract.”)
James F. Richards was the project manager for Richards & Associates during the construction of the jetties under the contract.
On July 6, 1960, Richards & Associates entered into a subcontract with Hunter Flores Company, Inc., of Freeport, Texas. Under the terms of the subcontract, it was the obligation of Richards & Associates to procure the stone for the jetties and transport it to the project site on barges, and to pay Hunter Flores Company, Inc., for unloading, stockpiling, and moving the stone to the jetties, and for the actual construction of the jetties in accordance with the plans and specifications of the contract. (The subcontract described *1042 in this -paragraph, will usually be referred to hereafter in the opinion as “the subcontract,” and Hunter Flores Company, Inc., will usually 'be referred to as “the subcontractor.”)
Work under the contract was begun promptly by the contractor and the subcontractor.
As previously indicated, the contractor retained for itself the responsibility for the procurement of the stone that was required in the construction of the jetties, and also the responsibility for the delivery of the stone to the project site. Arrangements for the procurement of the necessary stone were made with a quarry. In the initial stages of the project, the stone was transported by rail from the quarry to Corpus Christi, Texas, where the stone was transferred to barges rented by the contractor, and the barges were then towed by a tugboat, which the contractor engaged, from Corpus Christi along the Gulf Intracoastal Waterway in Laguna Madre to Port Mansfield, then eastward through the Port Mansfield channel to Padre Island. In order to provide an adequate area where the barges could be unloaded and turned around, the contractor, before beginning the actual delivery of stone to the project site, engaged a dredge and had it prepare a turning basin at the point where the barges were to be unloaded, near the landward end of the proposed north jetty. After transporting the stone by barges from Corpus Christi to the project site for a period of time, the contractor concluded that the long water haul was disadvantageous, and made arrangements for the stone to be delivered by rail to Rio Hondo, Texas, where the stone was transferred to the contractor’s barges, and the barges were towed down the Arroyo Colorado to the Gulf Intracoastal Waterway, then to Port Mansfield, and then to the project site through the Port Mansfield channel.
The subcontractor assumed the responsibility under the subcontract for unloading the stone from the contractor’s barges at the project site, stockpiling the stone, moving it from the stockpiles to the jetties, and constructing the jetties through the placement of the stone in accordance with the plans and specifications that constituted part of the contract. In order to perform this function, the subcontractor first prepared on Padre Island an unloading and operations area *1043 adjacent to the turning basin previously mentioned and near the landward end of the proposed north jetty. In this area, the subcontractor constructed a scale house and installed a scale for weighing the stone, and constructed a tool house. The subcontractor also assembled at the project site the necessary equipment for unloading, stockpiling, transporting, and placing the stone. This included three crawler cranes, a bulldozer, and several “dumpster” trucks. As stone was unloaded from the contractor’s barges, the subcontractor established stockpiles within the unloading and operations area. In order that the stone might be transported from the stockpiles to the site for the south jetty on the opposite side of the channel, a plug was built of sand across the channel and the top of the plug was covered with seashells, so that the plug could be used as a roadway for the subcontractor’s automotive equipment.
In constructing each of the jetties under the contract, the subcontractor began at the landward end of the jetty and constructed it in a seaward direction. Each jetty was to consist of blanket material on the bottom, then of an inner core consisting of core stone and of filler stone to make a compact mass, and then of cover stone on the sides and on top in order to hold the mass intact against wave energy. The placement of the various categories of stone was coordinated in such a way that, as the jetties were gradually extended seaward, they were virtually complete up to the point of construction at any time, except that the subcontractor did not place the prescribed cover stone over the tops of the jetties as the work progressed. The subcontractor delayed the placement of cover stone on the tops of the jetties in order that the inner core of core stone and filler stone in each jetty could be used as a roadway by the subcontractor’s automotive equipment in hauling stone to the points where it was needed for construction purposes as the two jetties were extended seaward. The roadway on the top of each jetty was approximately 16 feet wide.
Work under the contract was carried out by the contractor, and the subcontractor without interruption until the early part of September 1961. As of that time, good progress had *1044 been made, and tbe jetties project was about 80 percent complete.
On September 4,1961, tbe United States Weather Bureau issued a bulletin relative to tbe formation of a “tropical depression” in tbe Caribbean Sea, off tbe coast of Nicaragua. One week later, on September 11,1961, this “tropical depression,” which in tbe interim bad become a full-sized hurricane and as such bad been given tbe designation of “Carla,” crossed the Gulf Coast near Port O’Connor, Texas, on Mata-gorda Bay, to tbe northeast of Port Mansfield. Large waves generated near the eye of hurricane Carla overtopped all of Padre Island. They damaged practically everything at the jetties project. The plug roadway providing access to the south jetty was destroyed; the subcontractor’s equipment at the project site was damaged by water and sand; the subcontractor’s buildings were moved about and were damaged by the intrusion of mud and debris; the stockpiles of stone were disturbed and contaminated; and, since the tops of the partially completed jetties were not protected with cover stone, much of the filler stone that had been placed in the jetties was washed out, the core stone that had been placed in the jetties was tumbled about and displaced, and the roadways along the tops of the jetties were destroyed. Also, sand was washed by the waves into the turning basin and into the channel connecting the project site and the Gulf Intracoastal Waterway. In these and other ways, hurricane Carla caused substantial damage to the project, requiring much clean-up and repair work at great additional expense in order to restore the project to the condition in which it had been immediately prior to the hurricane.
The clean-up and repair work necessary to restore the jetties project to the condition in which it had been immediately prior to hurricane Carla was performed, and progress toward the completion of the project was resumed. The jetties were satisfactorily completed in accordance with the plans and specifications in April of 1962, and the project was accepted by the District on May 8,1962.
The District paid the contractor, at the unit per-ton prices prescribed in the contract, for all the stone that was used in the construction of the jetties, including all the extra stone *1045 that was required in order to repair the damage done by hurricane Carla to the partially completed jetties in September 1961.

The Administrative Decision

Although I agree with the defendant that the plaintiffs are not entitled to recover in this case, I disagree with the defendant’s contention that “The administrative denial of relief is final, conclusive, and determinative of this action.” This contention is supposedly based on the first section of the so-called Wunderlich Act (41 U.S.C. §321 (1964)), which declares, in effect, that a determination by an administrative agency on a question of fact arising under a Government contract shall be final and conclusive unless the same is fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or is not supported by substantial evidence.
The contract in this case contained the standard “changes,” “changed conditions,” and “disputes” provisions that are customarily inserted in Government construction contracts.
The “changes” provision of the contract was paragraph 3 under the heading of “General Provisions.” It stated that the contracting officer might at any time, “by a written order, * * * make changes in the drawings and/or specifications of this contract and within the general scope thereof,” and that an equitable adjustment should be made if such changes caused an increase or decrease in the amount due under the contract or in the time required for its performance. The paragraph further declared that if the parties failed to agree upon the adjustment to be made, the dispute should be determined under the “disputes” provision of the contract.
The “changed conditions” provision of the contract provided for the making of an equitable adjustment if the contractor should encounter “(1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.” Again, it was provided that if the parties failed to agree *1046 upon the adjustment to be made, the dispute should be determined under the “disputes” provision of the contract.
The “disputes” provision of the contract stated that “any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer,” and that the decision of the contracting officer should be final and conclusive unless the contractor, within 30 days, took a written appeal to th( Secretary of the Army. This provision further declared that, in the event of an appeal, the decision of the Secretary (or of his duly authorized representative) should 'be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, etc. (repeating the criteria of the Wunderlich Act).
Under the date of October 6,1961, the contractor submitted to the contracting officer a claim requesting compensation for the additional work and expenses that allegedly were required to restore the jetties project to the condition in which it had been immediately prior to hurricane Carla. The letter asserting the claim stated that it was submitted “for your consideration, acting under the provisions of Paragraph 3, CHANGES, * * * of the GENERAL CONDITIONS of the contract.”
The contracting officer rendered a decision on December 22, 1961, denying the contractor’s claim. In his decision, the contracting officer did not make any factual determinations, except for conclusional findings that included statements to the effect that the contracting officer “did not make changes in the drawings and/or specifications of this contract,” that the contractor “did not encounter subsurface or latent physical conditions at the site differing materially from those indicated in this contract,” and that the contractor “did not encounter unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.”
The contractor took a timely appeal from the contracting officer’s decision to the Corps of Engineers Board of Contract Appeals (acting for the Secretary of the Army), which docketed the appeal under the designation Eng BCA 2384.
*1047 On March. 26,1963, an attorney representing the defendant filed with the Corps of Engineers Board of Contract Appeals a motion to dismiss the contractor’s complaint “for failure to state a case upon which relief may be granted.”
On June 5,1963, the Corps of Engineers Board of Contract Appeals granted the defendant’s motion to dismiss and dismissed the contractor’s appeal on the ground that the complaint failed to state a case upon which relief could be granted. The Board did not make any determinations concerning questions of fact.
The contractor filed a motion for reconsideration of the order of dismissal dated June 5, 1963, and this motion was denied by the Corps of Engineers Board of Contract Appeals on January 8,1964.
It will be noted that under the “disputes” provision of this contract and under the first section of the Wunderlich Act, a decision by the Corps of Engineers Board of Contract Appeals is entitled to finality only if the decision relates to a question of fact arising under the contract and meets the criteria specified in the statutory provision. In this case, the decision which the Board made on June 5, 1963, and reaffirmed on January 8, 1964, did not include any determinations of a factual nature, but merely expressed the legal conclusion that the contractor had submitted a claim upon which the Board could not grant relief.
Obviously, the Board’s legal conclusion that it could not grant the contractor relief on the claim presented to it— which seems quite correct, since the contractor’s claim was clearly outside the scope of the “changes” and “changed conditions” provisions of the contract — is not an impediment to the contractor’s attempt to obtain judicial relief in the present case.

The Subcontractor's Extra Expenses

It was the subcontractor, rather than the contractor, that did most of the clean-up and repair work which was necessary after hurricane Carla in order to restore the jetties project to the condition in which it had been immediately prior to the hurricane. The contractor’s part of the extra work was to engage a dredge and have it dredge out the *1048 sand which waves generated by the hurricane had washed into the turning basin and into the channel to Port Mansfield. As sand was dredged from the turning basin, it was used in the rebuilding of the plug roadway across the channel between the two partially completed jetties.
The petition alleges that the extra dredging expenses occasioned by hurricane Carla amounted to $163,363.20, and that the other extra expenses attributable to the hurricane totaled $210,540, making a grand total of $373,903.20. A judgment against the defendant in the amount of $373,903.20 is requested.
It is clear that the plaintiffs, as the prime contractor, are not entitled to recover for themselves any extra expenses that were incurred by the subcontractor because of the damage done to the jetties project by hurricane Carla. Plaintiffs have abandoned any claim on behalf of the subcontractor and that claim is no longer in the case.

The Contractor*s Extra Expenses

As indicated in the preceding portion of this opinion, the contractor allegedly incurred extra expenses amounting to $163,363.20 in connection with the dredging of the sand which waves generated by hurricane Carla had washed into the turning basin and channel. No finding has been made as to the specific amount of the contractor’s extra costs occasioned by hurricane Carla, since the initial trial was limited to the issue of liability only, the amount of the recovery (if any) being reserved for further proceedings under Rule 47(c). It is sufficient for present purposes to note generally that the contractor did incur extra expenses which the contractor would not have been impelled to bear in the absence of hurricane Carla.
The evidence in the record makes it plain that the contractor, at the time when it submitted its bid on the proposed contract for the construction of the jetties near Port Mansfield, was well aware that the area of the Gulf Coast where the jetties were to be constructed is subject to hurricanes and tropical disturbances. In the first place, James F. Richards (acting for Richards & Associates) received, studied, and familiarized himself with the provisions of the proposed *1049 contract prior to the submission of the bid on behalf of Richards & Associates, and the proposed contract included, under the heading of “Special Conditions,” a paragraph which related to “Physical Data” and contained the following subparagraph:
(c) Hurricanes. — The pro j ect site is subj ect to damage from tropical disturbances.
Also, Mr. Richards visited the project site on two occasions before submitting the bid on behalf of Richards & Associates, and he obtained from local people information concerning local conditions, including local weather conditions. He was told (among other things) that the part of the Gulf Coast involved in this case is subject to hurricanes and tropical disturbances, but that there is less likelihood of hurricanes occurring in this particular area than in the portion of the Gulf Coast extending eastward from Galveston.
The contractor contends, however, that it had an understanding with the District to the effect that the contractor would be protected with respect to any extra expenses that might be incurred because of a hurricane. This contention is based upon a conference which Mr. Richards had with personnel of the District on May 24, 1960, shortly before Mr. Richards submitted the bid on behalf of Richards & Associates.
As previously indicated, Mr. Richards had been told that the area of the Gulf Coast where the proposed jetties were to be constructed is subject to hurricanes and tropical disturbances ; and on the morning of May 24,1960, he conferred with District personnel and inquired as to whether bids on the proposed contract for the construction of the jetties should reflect the costs that would 'be involved if hurricane or storm damage should occur. It is not possible to reproduce with certainty the details of the conversation between Mr. Richards and the District personnel, but Mr. Richards understood the District personnel to indicate that bidders need not concern themselves over the possibility of storm damage, as the Government would assume the risk of such damage, which was considered to be remote. On the other hand, it is inferred from all the evidence that the District personnel meant to convey the impression that, under the *1050 proposed contract, the Government would assume the risk of storm damage during construction to the extent of paying the contractor for any extra stone that might be required in order to repair the jetties if they should suffer storm damage while they were in the process of being constructed.
Prior to the conference between Mr. Richards and the District personnel on May 24, 1960, the District Engineer had sent to all the companies that were regarded as prospective bidders an invitation to attend a pre-bid conference in the Galveston offices of the District on May 6, 1960. This conference was called by the District Engineer because the jetties to be constructed near Port Mansfield would differ from any jetties previously constructed along the Gulf Coast, and it was considered desirable to afford prospective bidders an opportunity to discuss the proposed project with the District Engineer and his staff, and thereby obtain clarification of any provisions of the proposed plans and specifications concerning which the prospective bidders might have questions.
The James F. Richards Construction Company was on the list of prospective bidders for the jetties project, and received an invitation to attend the pre-bid conference on May 6, 1960. However, neither Mr. Richards nor any other representative of Richards & Associates attended that conference.
The conference was held on May 6,1960, as scheduled, and was attended by representatives of 18 different companies, as well as by the District Engineer and 12 of his assistants. During the course of the conference, several prospective bidders expressed concern over the possibility of storm damage occurring while the jetties were in the process of being constructed. In response to this, the District Engineer said that the proposed contract would be revised so as to impose on the Government the obligation to pay the contractor for all stone used in the construction of the jetties, including any extra stone that might be required in order to repair the jetties if they should suffer storm damage while they were in the process of being constructed.
*1051 Prior to the conference of May 6,1960, the proposed contract had contained, among the technical provisions, the following sentence:
* * * The contractor shall maintain the stone protection until accepted and any material displaced by any cause shall be replaced at his expense to the lines and grades shown on the drawings. * * *
Following the discussion at the conference on May 6, 1960, the District, by means of Addendum No. 1, deleted from the proposed contract the sentence just quoted. Subsequently, following hurricane Carla, the District did in fact pay the contractor for all the stone that was used in the construction of the jetties, including all the extra stone that was required in order to repair the damage done to the partially completed jetties by the hurricane.
Even if it clearly appeared that the District personnel with whom Mr. Richards conferred on May 24, 1960, went beyond the commitment which the District Engineer had made at the conference of May 6, 1960, and assured Mr. Richards that the contractor would be reimbursed for all the extra expenses that might be incurred as the result of hurricane action, the contractor still would be unable to recover in the present action. This is because the evidence in the record shows that the District personnel with whom Mr. Richards conferred on May 24 did not have any authority to change or vary the provisions of the proposed contract.
No officer or agent of the Government can act beyond the limits of his authority (Fansteel Metallurgical Corp. v. United States, 145 Ct. Cl. 496, 499, 172 F. Supp. 268, 270 (1959)); and anyone who enters into 'an arrangement with the Government on the basis of purported commitments made by Government personnel takes the risk of having accurately ascertained that such personnel was actually authorized to make the particular commitments (Wilber Nat'l. Bank v. United States, 294 U.S. 120, 123-124 (1935); Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384 (1947)).
In this case, the Government was entitled to receive from the contractor, and the contractor was obligated to perform, *1052 a construction job completed in accordance with, the plans and specifications of the contract. On the other hand, the contractor was entitled to receive from the Government, and the Government was obligated to pay, the unit prices prescribed in the contract. Both the contractor and the Government discharged their respective obligations under the contract. The circumstance that the contractor, because of hurricane Carla, experienced extraordinary difficulty in performing its construction obligation cannot have the effect of expanding the Government’s payment obligation beyond that prescribed in the contract. United States v. Spearin, 248 U.S. 132, 136 (1918); Columbus Ry. & Power Co. v. City of Columbus, 249 U.S. 399, 412 (1919).
The plaintiffs, having received the full contract price, are not entitled to recover any additional amount in the present action.

The Release

The discussion in the preceding portions of this opinion makes it unnecessary to discuss the effect of a release which the contractor signed on January 21, 1964, and which declared that “the United States of America and its employees are hereby released from all claims and demands whatsoever arising under or by virtue of said contract.”
FINDINGS on Fact
1. Port Mansfield, Texas, is located in Willacy County on the Gulf Coast of Texas, approximately 93 miles south of Corpus Christi and approximately 38 miles north of Port Isabel. It is situated on the west shore of Laguna Madre, a lagoon about 115 miles long that is separated from the Gulf of Mexico by Padre Island. The Gulf Intracoastal Waterway runs through the length of Laguna Madre, providing a depth of 12 feet in a channel 125 feet wide in the lagoon, which has natural depths of less than 10 feet. Padre Island, at the point nearest to Port Mansfield, lies about 9 miles across Laguna Madre. It consists of an offshore sandbar formation which varies from % mile to 2 miles in width and from 2 feet to 16 feet in elevation.
2. Prior to 1960, local interests had expended substantial sums of money in navigation improvements that provided *1053 (among other things) a channel from Port Mansfield eastward to the Gulf of Mexico, across Laguna Madre and through Padre Island. The Gulf end of this channel was flanked, on the north and on the south, by two concrete tetrapod jetties, which had been built by the Willacy County Navigation District. However, these tetrapod jetties, for some reason, had settled below the surface of the Gulf by 1960, and new jetties were required for the adequate protection and maintenance of the channel.
3. (a) In April 1960, the U.S. Army Engineer District at Galveston, Texas (which will usually be referred to hereafter in the findings as “the District”), issued an invitation for bids (No. CIYENG-41-243-60-63) on a proposed contract for the construction of stone jetties to replace those mentioned in finding 2.
(b) The proposed contract provided (among other things) that the contractor would be compensated for the blanket material, the core stone, the filler stone, and the cover stone used in constructing the jetties pursuant to the plans and specifications of the contract, such compensation to be computed on the basis of unit per-ton prices for the various classes of stone as agreed to by the parties in the competitive bidding procedure.
(c) The proposed contract contained the following “General Provisions” (among others):
3. CHANGES
The Contracting Officer may at any time, by a written order, and without notice to the sureties, make changes in the drawings and/or specifications of this contract and within the general scope thereof. If such changes cause an increase or decrease in the amount due under this contract, or in the time required for its performance, an equitable adjustment shall be made and the contract shall be modified in writing accordingly. Any claim of the Contractor for adjustment under this clause must be asserted in writing within 30 days from the date of receipt by the contractor of the notification of change: Provided, however, That the Contracting Officer, if he determines that the facts justify such action, may receive and consider, and adjust any such claim asserted at any time prior to the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made the dispute shall be determined as provided in *1054 Clause 6 hereof. But nothing provided in this clause shall excuse the Contractor from proceeding with the prosecution of the work as changed. Except as otherwise herein provided, no charge for any extra work or material will be allowed.
4. ChaNGed Conditions
The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of: (1) subsurface or latent physical conditions at the site differing materially from those indicated in this contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized. as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do so materially differ and cause an increase or decrease in the cost of, or the time required for, performance of this contract, an equitable adjustment shall be made and the contract modified in writing accordingly. Any claim of the Contractor for adjustment hereunder shall not be allowed unless he has given notice as above required ; provided that the Contracting Officer may, if he determines the facts so justify, consider and adjust any such claim asserted before the date of final settlement of the contract. If the parties fail to agree upon the adjustment to be made, the dispute shall be determined as provided in Clause 6 hereof.
6. Disputes
(a) Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. The decision of the Contracting Officer shall be final and conclusive unless, within 30 days from the date of receipt of such copy, the Contractor mails or otherwise furnishes to the Contracting Officer a written appeal addressed to the Secretary. The decision of the Secretary or his duly authorized representative for the determination of such appeals shall be final and conclusive unless determined by a court of competent jurisdiction to have been fraudulent, or capricious, or arbitrary, or so grossly erroneous as necessarily to imply bad faith, or not supported by substantial evidence. In connection with any appeal proceeding *1055 under this clause, the Contractor shall be afforded an opportunity to be heard and to offer evidence in support of its appeal. Pending final decision of a dispute hereunder, the Contractor shall proceed diligently with the performance of the contract and in accordance with the Contracting Officers decision.
(b) This “Disputes” clause does not preclude consideration of law questions in connection with decisions provided for in paragraph (a) above: Provided, That nothing in this contract shall be construed as malting final the decision of any administrative official, representative, or board on a question of law.
(d) The proposed contract included, under the heading of “Special Conditions,” a provision designated as SC-03, which stated in part as follows:
SC-03 Physical Data: Information and data furnished or referred to below are furnished for information only and it is expressly understood that the Government will not be responsible for any interpretation or conclusion drawn therefrom by the contractor.
(c) Hurricanes.- — -The project site is subject to damage from tropical disturbances.
(e) Tidal Conditions. — Normally, the mean tide range at the site of the work is approximately 1.5 feet. Strong northerly winds during the winter may depress the surface as much as three feet below mean low tide, while strong southerly winds may have the opposite effect.
(e) The proposed contract contained a number of technical provisions, one of which was designated as 2-05 (b) and contained the following sentence:
* * * The contractor shall maintain the stone protection until accepted and any material displaced by any cause shall be replaced at his expense to the lines and grades shown on the drawings. * * *
4. Under the date of April 22,1960, the District sent to all persons who had been listed as prospective bidders for the proposed contract mentioned in finding 3 a “Notice to Prospective Bidders,” inviting them to attend a conference in Galveston on May 6,1960, relative to the proposed contract. This conference was called by the District Engineer because the jetties to be constructed near Port Mansfield would differ *1056 from any jetties previously constructed along the Gulf Coast, and it was considered desirable to afford prospective bidders an opportunity to discuss the proposed project with the District Engineer and his staff, and thereby obtain clarification of any provisions in the proposed plans and specifications concerning which the prospective bidders might have questions.[1]
5. The conference mentioned in finding 4 was held on May 6, 1960, in the Galveston offices of the District. It was attended by representatives of 18 different companies, as well as by the District Engineer and 12 of his assistants. No representative of the plaintiffs was present at the conference. During the course of the conference, several prospective bidders expressed concern over the possibility of storm damage occurring while the jetties were in the process of being constructed. In response to this, the District Engineer said that the proposed contract would be revised so as to impose on the Govermnent the obligation to pay the contractor for all stone used in the construction of the jetties, including any extra stone that might 'be required in order to repair the jetties if they should suffer storm damage while they were in the process of being constructed.
6. On May 12,1960, as a result of the discussion mentioned in finding 5, the District, by means of Addenum No. 1 to the invitation for bids referred to in finding 3, deleted from the proposed contract the sentence in technical provision 2-05 (b) that is quoted in finding 3(e).[2]
7. (a) The James F. Eichards Construction Company, of Minneapolis, Minnesota, was on the list of prospective bidders for the jetties project near Port Mansfield and received a copy of the invitation for bids referred to in finding 3, a copy of the notice mentioned in finding 4, and a copy of *1057 Addendum No. 1 referred to in finding 6. James F. Richards, head of that company, visited the site of the proposed jetties project on May 3 or 4,1960. Subsequently, on or about May 18,1960, Mr. Richards again visited the project site, accompanied by representatives of two other companies, the A. Kertzman Dredging Company and the Midwest Dredging Company. Mr. Richards obtained from local people information concerning local conditions, including local weather conditions. He was told (among other things) that the area of the Gulf Coast where the jetties were to be constructed is subject to hurricanes and tropical disturbances, but that there is less likelihood of hurricanes occurring in this particular area than in the portion of the Gulf Coast extending eastward from Galveston.
(b) Neither Mr. Richards nor any other representative of the J ames F. Richards Construction Company, the A. Kertz-man Dredging Company, or the Midwest Dredging Company attended the conference that was held in Galveston on May 6, 1960 (seefinding 5).
(c) After making the investigation mentioned in paragraph (a) of this finding, Mr. Richards prepared a bid for the proposed contract on behalf of the James F. Richards Construction Company, the A. Kertzman Dredging Company, and the Midwest Dredging Company, the three companies acting as joint venturers and using the name of Richards & Associates. In connection with the bid, Mr. Richards read over the proposed contract and familiarized himself with its terms, and he consulted his attorney in Minneapolis.
8. (a) James F. Richards went to Galveston for the purpose of submitting the bid referred to in finding 7(c). On the morning of May 24, 1960, before submitting the 'bid to the District, Mr. Richards conferred with personnel of the District. As indicated in finding 7(a), Mr. Richards had been told that the area of the Gulf Coast where the proposed jetties were to be constructed is subject to hurricanes and tropical disturbances; and Mr. Richards inquired of the District personnel as to whether bids on the proposed contract for the construction of the jetties should reflect the extra costs that would be involved if hurricane or storm damage should *1058 occur. It is not possible to reproduce with certainty the details of the conversation between Mr. Richards and the District personnel, but Mr. Richards understood the District personnel to indicate that bidders need not concern themselves over the possibility of storm damage, as the Government would assume the risk of such damage, which was considered to be remote. On the other hand, it is inferred from all the evidence that the District personnel meant to convey the impression that under the proposed contract, as revised, the Government would assume the risk of storm damage during construction to the extent of paying the contractor for any extra stone that might be required in order to repair the jetties if they should suffer storm damage while they were in the process of being constructed.
(b) The District personnel with whom James F. Richards conferred on the morning of May 24, 1960, as indicated in paragraph (a) of this finding, did not have any authority to change or vary the provisions of the proposed contract.
(c) After conferring with the District personnel, Mr. Richards then submitted to the District on May 24,1960, the bid that had been prepared on behalf of the three joint ven-turers known collectively as Richards & Associates.
(d) At the time when the bid on behalf of the joint ven-turers was submitted, neither Mr. Richards nor any other representative of the joint venturers was aware of the discussion referred to in finding 5 relative to the possibility of storm damage.
9. (a) When the bids which had been submitted in response to the invitation previously referred to were opened by the District on May 24,1960, it was determined by the contracting officer that James F. Richards Construction Company, A. Kertzman Dredging Company, and Midwest Dredging Company, acting as joint venturers, were the lowest responsible bidder. Accordingly, the contract was awarded to the joint venturers. (For the sake of convenience, the three companies comprising the joint venture will usually be referred to collectively hereafter in the findings as “Richards & Associates” or as “the contractor.”)
*1059 (b) On or about June 6, 1960, a contract (No. DA-41-243-CI VENG-60-124) was signed by a contracting officer of the Corps of Engineers on behalf of the defendant and by Richards & Associates as the contractor for the construction of the jetties near Port Mansfield in accordance with the plans and specifications that constituted part of the contract. A construction period of 750 days was provided for in the contract. The total amount of the contract, on the basis of the unit prices and estimated quantities set out in the contract, was $2,493,860. (This contract will usually be referred to hereafter in the findings as “the contract.”)
(c) The contract contained the provisions referred to in finding 3, except for the sentence quoted in paragraph (e) of that finding. The contract specified the unit per-ton prices which the parties had agreed upon as payable to the contractor for the several categories of stone used in constructing thejetties.
10. James F. Richards was the project manager for the contractor during the construction of the jetties under the contract.
11. (a) On July 6,1960, Richards & Associates entered into a subcontract with Hunter Flores Company, Inc., of Freeport, Texas. This subcontract provided in part as follows:
1. Performance of the job requires delivery of a sub-substantial quantity of rock to the job site by barge. Richards will deliver such rock to the unloading facilities of Flores at the job site in minimum quantities of 1,000 tons per day for unloading, hauling, weighing, stockpiling and placing by Flores as hereinafter specified. Richards will undertake to increase such quantity of daily delivery of rock to a maximum of 2,000 tons per day as soon as possible, but will give Flores not less than three (3) weeks’ notice before more than 1,000 tons of rock are furnished daily.
2. Flores will place the rock as required in the “SPECIFICATIONS FOR JETTIES” for the job, dated April, 1960, and all addenda thereto, issued by said Corps of Engineers, the same being referred to hereinafter as the “specifications”, and in particular will perform the following items required by the specifications :
*1060 A. Mobilization, and demobilization of equipment as required in Item #1 of the bidding schedules for the job, which is also described as Item SC-10 (a) of the specifications on page SC-7. Mores will be paid $30,000.00 for the performance of this item.
B. One (1) inspector’s building will be erected on Padre Island as described in Item SC-12, page SC-7 of the specifications. No separate payment shall be made for this item.
C. Excavation work as described in Item #2 of the bidding schedules and also described in PART III, SECTION 1, page 1-1 of the specifications. No separate payment shall be made for this item, but it shall be performed as promptly as possible hereafter.
D. Jetty stone shall be placed as required and described in PART III, SECTION 2, page 2-1 to 2-5 inclusive, of the specifications. Flores shall, be paid $1.30 per ton for all classifications of stone placed as required thereunder.
E. Installation of a PROJECT BULLETIN BOARD as required by PART III, SECTION 3, page 3-1 of the specifications. No separate payment shall be made for this item.
3. Flores covenants that it will perform the portion of the job undertaken by it hereunder in accordance with the bid requirements, specifications, drawings, general conditions, special conditions and technical conditions set forth at the date hereof and hereafter, for the performance of the job by said Corps of Engineers and that it will particularly observe all safety requirements so specified. Flores acknowledges that it has had an opportunity to examine the plans, specifications and addenda for such job, has inspected the job site and is fully familiar with the same and the requirements of labor, materials and equipment therefor and that it can and will provide the same.
9. Said Corps of Engineers will make monthly estimates of the work completed by Flores and will pay Richards therefor. Within five (5) days of receipt of such payment by Richards, Richards will pay Flores for the quantity of stone placed by Flores as shown by such monthly estimate. The sum of $30,000.00 to be paid for work performed under paragraph 2.A above shall likewise be paid by Richards to Flores within five (5) days of payment for such work by said Corps of Engineers to Richards. All payments shall be subject to *1061 the percent of retention specified by the general contract with said Corps of Engineers.
(b) It was the intention of the parties to the subcontract of July 6,1960, that the relationship of Hunter Flores Company, Inc., to Richards & Associates should be that of an independent contractor. Accordingly, it was agreed expressly that “Richards is not guaranteeing any profit to Flores in the performance of the job and any loss therein will be borne entirely by Flores.”
(c) Under the terms of the subcontract, it was the obligation of Richards & Associates to procure the stone for the jetties and transport it to the job site on barges, and to pay Hunter Flores Company, Inc., for unloading, stockpiling, and moving the stone to the jetties, and for the actual construction of the jetties. (The subcontract described in this finding will usually be referred to hereafter in the findings as “the subcontract” and Hunter Flores Company, 3hc., will usually be referred to as “the subcontractor.”)
12. (a) Work under the contract was begun promptly by the contractor and the subcontractor.
(b) The contractor retained for itself the responsibility for the procurement of the stone that was required in the construction of the jetties, and also the responsibility for the delivery of the stone to the project site. Arrangements for the procurement of the necessary stone were made with a quarry. In the initial stages of the project, the stone was transported by rail from the quarry to Corpus Christi, Texas, where the stone was transferred to barges rented by the contractor, and the barges were then towed by a tugboat, which the contractor engaged, from Corpus Christi along the Gulf Intracoastal Waterway in Laguna Madre to Port Mansfield, then eastward through the Port Mansfield channel to Padre Island. In order to provide an adequate area where the barges could be unloaded and turned around, the contractor, before beginning the actual delivery of stone to the project site, engaged a dredge and had it prepare a turning basin at the point where the barges were to be unloaded, near the landward end of the proposed north jetty. After transporting the stone by barges from Corpus Christi to the project site for a period of time, the contractor con- *1062 eluded that the long water haul was disadvantageous, and made arrangements for the stone to be delivered by rail to Eio Hondo, Texas, where the stone was transferred to the contractor’s barges, and the barges were towed down the Arroyo Colorado to the Gulf Intracoastal Waterway, then to Port Mansfield, and then to the project site through the Port Mansfield channel. Up until the early part of September 1961, it was necessary for the contractor on three separate occasions to engage a dredge and have it dredge out the Port Mansfield channel in order to remove sand bars or shoaled areas of sand that had been caused by wind blowing sand into the channel or by wave action from boats pulling sand from the banks into the channel.
(c) The subcontractor assumed the responsibility under the subcontract for unloading the stone from the contractor’s barges at the project site, stockpiling the stone, moving it from the stockpiles to the jetties, and constructing the jetties through the placement of the stone in accordance with the plans and specifications that constituted part of the contract. In order to perform this function, the subcontractor first prepared on Padre Island an unloading and operations area adjacent to the turning basin previously mentioned and near the landward end of the proposed north jetty. In this area, the subcontractor constructed a scale house and installed a scale for weighing the stone, and constructed a tool house. The subcontractor also assembled at the project site the necessary equipment for unloading, stockpiling, transporting, and placing the stone. This included three crawler cranes, a bulldozer, and several “dumpster” trucks. As stone was unloaded from the contractor’s barges, the subcontractor established stockpiles within the unloading and operations area. In order that the stone might be transported from the stockpiles to the site for the south jetty on the opposite side of the channel, a plug was built of sand across the channel and the top of the plug was covered with seashells, so that the plug could be used as a roadway for the subcontractor’s automotive equipment.[3]
*1063 (d) In constructing each of the jetties under the contract, the subcontractor began at the landward end of the jetty and constructed it in a seaward direction. Each jetty was to consist of blanket material on the bottom, then of an inner core consisting of core stone and of filler stone to make a compact mass, and then of cover stone on the sides and on the top in order to hold the mass intact against wave energy. The placement of the various categories of stone was coordinated in such a way that, as the jetties were gradually extended seaward, they were virtually complete up to the point of construction at any time, except that the subcontractor did not place the prescribed cover stone over the tops of the jetties as the work progressed. The subcontractor delayed the placement of cover stone on the tops of the jetties in order that the inner core of core stone and filler stone in each jetty could be used as a roadway by the subcontractor’s automotive equipment in hauling stone to the points where it was needed for construction purposes as the two jetties were extended seaward. The roadway on top of each jetty was approximately 16 feet wide.
13. (a) Work under the contract was carried forward by the contractor and the subcontractor without interruption until the early part of September 1961. As of that time, good progress had been made, and the jetties project was about 80 percent complete.
(b) A 'bulletin issued by the United States Weather Bureau on September 4, 1961, gave notice of the formation of a “tropical depression” in the Caribbean Sea, off the coast of Nicaragua. One week later, on September 11, 1961, this “tropical depression,” which in the interim had become a full-sized hurricane and as such had been designated “Carla,” crossed the Gulf Coast near Port O’Connor, Texas, on Mata-gorda Bay, to the northeast of Port Mansfield.
(c) Persons along the Gulf Coast had timely warnings of the approach of hurricane Carla, owing to bulletins issued by the United States Weather Bureau and announcements in various news media, as well as cooperative efforts of local police and other officials, Civil Defense, and disaster relief agencies.
*1064 (d) Upon the advent of hurricane Carla, the subcontractor dumped cover stone over the exposed ends of the jetties, which were approximately 80 percent completed at that time. This was a wise move and served to protect the unfinished jetties during the period in which they were subjected to abnormally high tides and storm wave action. After the passage of the hurricane, it was necessary to remove the cover stone from the ends of the partially completed jetties, so that the jetties might be completed in accordance with the contract.
(e) Large waves generated near the eye of hurricane Carla overtopped all of Padre Island. They damaged practically everything at the jetties project. The plug roadway providing access to the south jetty was destroyed; the subcontractor’s equipment at the project site was damaged by water and sand; the subcontractor’s buildings were moved about and were damaged by the intrusion of mud and debris; the stockpiles of stone were disturbed and contaminated; and, because of the lack of cover stone over the tops of the partially completed jetties, much of the filler stone that had been placed in the jetties was washed out, the core stone that had been placed in the jetties was tumbled about and displaced, and the roadways along the tops of the jetties were destroyed. Also, waves generated by the hurricane washed sand into the turning basin and into the channel connecting the project site with the Gulf Intracoastal Waterway. In these and other ways, hurricane Carla caused substantial damage' to the project, requiring much clean-up and repair work at great additional expense in order to restore the project to the condition in which it had been immediately prior to- the hurricane.[4]
14. (a) The clean-up and repair work necessary to restore the jetties project to the condition in which it had been immediately prior to hurricane Carla was performed, and progress toward the completion of the project was resumed. Most of the clean-up and repair work was done by the subcontractor. However, the contractor engaged a dredge and had it dredge out sand which waves generated by the hurri *1065 cane bad washed into the turning basin and into the channel to Port Mansfield; and the sand dredged from the turning basin was used in the rebuilding of the plug roadway across the channel between the two jetties.
(b) The j etties were satisfactorily completed in accordance with the plans and specifications in April of 1962, and the completed project was accepted by the defendent on May 8,1962.
(c) The District paid the contractor, at the unit per-ton prices prescribed in the contract, for all the stone that was used in the construction of the jetties, including all the extra stone that was required in order to repair the damage done by hurricane Carla to the partially completed jetties in September 1961. In paying the contractor, however, the- District withheld $100 of the contract price until after January 21, 1964, because of the existence of a claim (see findings 15-21).
15. By a letter dated September 13, 1961, the contractor notified the District of the damage resulting from hurricane Carla, and indicated that compensation would be claimed for the additional work and expenses which would be required in order to restore the project to the condition in which it had been immediately prior to the hurricane.
16. (a) Under the date of October 6,1961, the contractor submitted to the contracting officer a claim requesting compensation, in an unspecified amount, for the additional work and expenses that allegedly were required to restore the jetties project to the condition in which it had been immediately prior to hurricane Carla. The letter asserting the claim stated in part as follows:
We respectfully submit for your consideration, acting under the provisions of Paragraph 3, CHANGES, page 1, of the GENERAL CONDITIONS of the contract, claims for the following work performed by us and our subcontractor in behalf of, and in the best interest of the United States Government: to-wit:
1. Dredging and incidental work to restore your channel to conditions as of 6 June 1960 from 22 December 1960 until such time as we clear and restore the channel under present operations.
2. Removal of sand and debris from the following areas:
a. Unloading area along harbor.
*1066 b. Roadways to the north and east of scale.
c. Jetty areas as necessary to finish permanent work.
3. Replace, rebuild and repair plug and roadway across the mouth of the channel which provided access to the south jetty.
4. Repair, replace, and rebuild the scale, scale house, and other buildings, tanks, docks, and structures damaged by later described conditions.
6.Reclamation and loss of stockpiled stone which was to be used in the permanent jetties.
6. Clearance of sand and debris washed into existing harbor area.
7. Clean, replace, repair, and rebuild, by use of hand labor, equipment and materials, the present jetties to the condition as existed as of 7 September 1961.
(b) The contracting officer, without granting the contractor a hearing for the introduction of evidence relative to the extra expenses that the contractor and subcontractor incurred because of the damage done to the jetties project by hurricane Carla, rendered a decision on December 22, 1961, denying the contractor’s claim. The contracting officer did not make any factual determinations, except for certain conclusional determinations, and among them were the following:
7. The Contracting Officer, and his representatives, did not make changes in the drawings and/or specifications of this contract.
8. The Contractor did not encounter subsurface or latent physical conditions at the site differing materially from those indicated in this contract.
9. The Contractor did not encounter unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.
(c) Under the date of December 29, 1961, the contractor took a timely appeal from the contracting officer’s decision.
(d) The contractor’s appeal was docketed by the Corps of Engineers Board of Contract Appeals under the designation Eng BCA 2384.
(e) On March 26, 1963, an attorney representing the defendant filed with the Corps of Engineers Board of Con *1067 tract Appeals a motion to dismiss tbe contractor’s complaint “for failure to state a case upon which relief may be granted.”
(f) On June 5,1963, the Corps of Engineers Board of Contract Appeals granted the defendant’s motion to dismiss and dismissed the contractor’s appeal on the ground that the complaint failed to state a case on which relief could be granted. The Board did not grant the contractor any sort of hearing for the introduction of evidence, and the Board did not make any determinations concerning questions of fact.
17. (a) On July 2,1963, the District sent to the contractor a final payment estimate and a final payment release with respect to the contract, along with a covering letter. The letter requested that the contractor sign the vendor’s certificate on the original estimate and properly execute three copies of the release, and then mail the documents to the District Engineer.
(b) On July 6, 1963, the contractor responded to the letter mentioned in paragraph (a) of this finding, and stated as follows:
We are returning herewith, unsigned, Estimate No. 35 and final payment release for above referred contract.
Our reason for returning this Estimate is that our Subcontractor, Hunter Flores, Inc. has elected to continue his claim for storm damages, and we are advised to keep the contract open.
18. (a) On August 5, 1963, the contractor filed with the Corps of Engineers Board of Contract Appeals what was in effect a motion for reconsideration of the order of dismissal dated June 5,1963.
(b) The contractor’s motion for reconsideration of the order of dismissal dated June 5,1963, was denied by the Corps of Engineers Board of Contract Appeals on January 8,1964.
19. Under the date of January 14,1964, the District wrote a letter to the contractor, stating in part as follows:
Reference is made to Engineer Board of Claims and Appeals order of 8 January 1964 denying motions for reconsideration of your claim under Contract No. DA-41-243-CIVENG-60-124, and to your letter of 6 July *1068 1963 returning the unsigned final payment estimate and final payment release.
In view of the action of the Board in denying the motions for reconsideration and the affirming of the order to dismiss, inclosed are Final Payment Estimate — Contract Performance No. 35 and Final Payment Release for execution and return to this office so that the contract records can be closed.
The original estimate is to be signed by an authorized official of your company and three copies of the release properly executed and returned * * *.
20. On January 17, 1964, the contractor’s attorney wrote the following letter to the District:
I am in receipt of a copy of your letter of J anuary 14, addressed to J ames F. Richards Contraction Company, et al, pertaining to the claim under Contract No. DA-41-243-CI VEN Gr-60-124.
I hope it will be possible for you to go ahead and make a final settlement with James F. Richards Construction Company, et al, but I think it appropriate that I advise you that an appeal of this claim will be perfected to the United States Court of Claims.
21. The District’s letter mentioned in finding 19 was received and acted upon for the contractor by James F. Richards. Mr. Richards believed that since all proceedings before the administrative agency had been concluded, he could sign the release which had been submitted by the District, accept the remainder of the contract price ($100) which had been retained by the District, and close out the contractor’s books in so far as the contract itself was concerned, without affecting the contractor’s right to attempt through court action to obtain damages from the defendant with respect to the additional expenses that had been occasioned by hurricane Carla. On J anuary 21,1964, Mr. Richards signed on behalf of the contractor the release which had been submitted by the District with respect to the contract. The release stated as follows:
The work under the above numbered contract between the United States of America and the undersigned contractor, having been completed and finally accepted; subject to receipt of final payment in the amount of $100.00, the United States of America and its employees are hereby released from all claims and demands whatsoever arising under or by virtue of said contract.
*1069 Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that the plaintiffs are not entitled to recover, and the petition is dismissed.

The opinion, findings of fact, and recommended conclusion of law are submitted under the order of reference and Rule 57(a).

 The original plaintiffs included the three companies named above and Hunter Flores Company, Inc., a subcontractor. However, Hunter Flores Company, Inc., withdrew from the case at the trial.

AnotIier reason (not pertinent to this litigation) for holding the conference was that some suppliers of stone had requested a conference in order to ash that the specifications of the proposed contract be amended so as to permit the use of limestone, as opposed to requiring granite exclusively, in the construction of the jetties.

 Addendum No. 1 made other changes in the proposed contract, but none of them was significant from the standpoint of the present litigation. Addendum No. 2, which was issued by the District on May 19, 1960, made further changes in the proposed contract, hut such changes were also without significance in so far as the present case is concerned.

 The plug was built, at least in part, by the contractor through the placement of sand as it was dredged up in connection with the preparation of the turning basin mentioned in paragraph (b) of this finding.

 The details concerning the extent of the damages are not material at the present time, since the initial trial was on the issue of liability only, with the amount of the recovery, if any, being left for further proceedings under Rule 47(c).