**NATIONAL BANK OF NORTH AMERICA**

**v.**

**The UNITED STATES.**

**No. 297–69.**

United States Court of Claims.

March 17, 1972.

findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's motion and adopts the same as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

BENNETT, Chief Commissioner:

This claim is one for breach of implied contract and of a Navy regulation (instruction). Plaintiff seeks to recover the sum of $41,102 stipulated to have been stolen from the plaintiff bank in a daylight robbery on June 26, 1968. Plaintiff, the National Bank of North America, operated a branch in a basement room of the naval installation at St. Albans Naval Hospital, Queens, New York. The parties agree that the operation of banking facilities at the hospital was pursuant to the terms, conditions, and regulations set forth in the Secretary of the Navy Instruction No. 5381.1A (hereinafter referred to as the instruction), dated October 25, 1962. This instruction was issued by the Department of the Navy in cooperation with the Treasury. In defining the space and services to be provided by defendant, the instruction stated in pertinent part, in section I, paragraph 2e:

e. Other logistic support to be furnished at the expense of the Department of the Navy:

\* \* \* \* \* \*

(3) Military or civilian guards (the latter to be used within the installation only) or military police or other protective service for necessary periods of time on paydays; to accompany shipments of money from the parent bank to the banking facility when such moneys are for the use of the disbursing officer primarily; or at other times involving unusual circumstances as may be required to avoid undue risks or costs of insurance on the part of the banking facility. In this connection consideration should

Anthony J. D'Auria, New York City, attorney of record, for plaintiff. Joseph DiBenedetto and Cole & Deitz, New York City, of counsel.

Judith Ann Yannello, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Chief Trial Commissioner Marion T. Bennett with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on November 22, 1971. On December 20, 1971, plaintiff filed a notice of intention to except to the commissioner's report but on January 28, 1972, plaintiff filed a withdrawal of such notice. On February 1, 1972, defendant filed a motion requesting that the court adopt the commissioner's opinion as the basis for its judgment in this case. Since the court agrees with the commissioner's opinion,

be given to overall security factors normally present.

Plaintiff's evidence is that, when "unusual circumstances" existed at the bank suggesting the need of special protection by guards to avoid undue risks, defendant had provided the same except during the week of the robbery. Plaintiff's evidence shows that in the prior year and in the week prior to the robbery, it was given such supplemental protection, but that over its protest, the guards were not supplied during the week when the robbery took place, although plaintiff says defendant promised to post guards then. Plaintiff says that the circumstances were such as to put defendant under a duty to provide guards on the day that the robbery occurred and that having assumed the duty of providing guards, and having failed in that duty as imposed by the instruction or regulation, the risk of loss should fall on defendant. The decision to remove the guards was the unilateral decision of defendant.

Defendant rejects these contentions saying that the loss was not the result of defendant's action, that defendant had fulfilled its obligations under the instruction and was not obligated to furnish a guard on the date in question, that defendant had not promised such a guard on said date, and that in any event the court has no jurisdiction over the claim because the instruction did not provide that defendant could be held liable for a loss such as occurred here.

The facts as established by evidence adduced at the trial are that the hospital hierarchy relevant here consisted of the commanding officer, the administrative officer, the security officer, and the petty officer, in descending order of authority. Only the commanding officer or the administrative officer had authority to post or remove special armed guards which might be assigned for protection of the bank. The security officer, upon consultation with the bank manager, made recommendations about the need for guards on occasion and was the contact between the bank and the administrative officer. The latter had broad authority and the commander received information from him about the situation at the bank on a "need-to-know" basis. The two top authorities at the hospital interpreted the instruction for the posting of additional guards at the bank under "unusual circumstances" as being limited to conditions constituting a real threat to the security of the bank, above that controlled by normal security measures. They gave consideration in this connection to the overall security factors normally present, as the instruction required.

The normal security measures at the hospital included a fence around the property with two entrances through the same guarded by sentries. The grounds were patrolled around the clock by a roving patrol of approximately 60 marines. A small patrol of 18 men patrolled the interior of the hospital and two of them were assigned to the general area in which the bank was located. There were 38 additional men subject to call and on paydays (Thursdays) the Navy provided the bank a master-at-arms to help traffic control of the many bank customers on that day. It is agreed that the bank did not furnish guards for itself nor was it requested to or obligated to do so by the aforesaid instruction.

In December 1967, the Federal Bureau of Investigation reported to the bank manager and to the commanding officer and administrative officer of the Navy hospital that an informant had indicated that the bank would be robbed on December 15, or soon thereafter. Considering that this was a very real threat, the Navy acted pursuant to the instruction and posted guards armed with sawed-off shotguns at the bank on a round-the-clock schedule for the week in question. When the FBI advised defendant the threat had apparently passed, defendant nevertheless kept a roving patrol in the area of the bank for several weeks thereafter, supplementing the normal security precautions.

Several months then passed without incident, but on Monday and Tuesday,

June 17–18, 1968, two different Caucasian strangers appeared in the bank, and the suspicions of the manager were aroused by their conduct and, as to one, by his shabby clothing as well. This was reported to the hospital's own security officer by the bank manager. The administrative officer thereupon directed the posting of armed guards at the bank pending results of an investigation. The investigation was conducted by the FBI, the Naval Investigative Service, and the hospital security division. One of the suspicious individuals was identified as a contract window washer with a legitimate reason for presence in the bank. The other individual who was present on June 18 was not identified because the available description of him was vague. Some screws were found to be missing from a window grille. The grille was promptly repaired by defendant.

On Friday, June 21, 1968, the administrative officer concluded that no longer did an unusual circumstance exist requiring special guards and ordered that they be withdrawn after that date. This decision was not communicated to the bank manager and when she did not see armed guards present on Monday morning, June 24, she protested to the defendant's security officer. He took the matter up with the administrative officer who refused to authorize that they be posted again, for, as noted, he was satisfied that no unusual circumstances existed which posed an undue risk to the bank.

On Tuesday, June 25, 1968, the bank manager again protested the absence of guards and contacted her own security officer who took the matter up with the security officer for the hospital, to no avail. A guard was promised for paydays (Thursdays), as the instruction required. The parties are in disagreement over whether the hospital security officer promised that guards would be posted on Tuesday, June 25, or Wednesday, June 26. Plaintiff says the guards were promised but it is clear the security officer for the hospital had no authority to make such a promise, if he did so. He had always advised his superior when guards were requested or when he thought they were needed, and they were always provided prior to the week of June 24, 1968. The bank, therefore, felt no need to furnish guards of its own, although hindsight suggests it would have done so during the critical week had it been .convinced defendant would not furnish them.

On Wednesday morning, June 26, 1968, the hospital security officer made what now appears to be a serious mistake of judgment. On the spur of the moment he decided, with the approval of the administrative officer, to conduct a fire drill at a point on the hospital grounds far removed from the bank. The security guards were needed and used in connection with the drill. The fire drill was a big success, but while it was being conducted the bank was robbed of $41,102 by three black bandits wearing masks, dark glasses, and surgical gloves. One wore a surgical gown. They made a clean getaway and were never caught. None of the money was ever recovered. In retrospect, the hospital security officer told the bank manager and security officer that it was intended to post guards at the bank after they were released from duty at the fire drill. This was not corroborated by the administrative officer nor is there evidence that he had changed his mind about the need for the guards or had authorized his subordinate to post them at any time on June 26. Even had he done so, there is no assurance they would have been inevitably successful in thwarting or postponing the robbery although their earlier presence probably did so. Guarded banks, however, do get robbed. It is some small comfort, for all but the robbers, to know that the large shipment of money the bank received each Wednesday for the following payday had not arrived by the time of the robbery. It came a little later, without untoward event.

■ Defendant asserts as a threshold issue a challenge to the jurisdiction of

the court to decide this case. It says that the regulation, here called an instruction, which admittedly governs the relations of the parties herein, provides that the Navy shall furnish additional security guards at such "times involving unusual circumstances as may be required to avoid undue risks or costs of insurance on the part of the banking facility," but is silent as to any authorization for the payment of money for losses by robbery or theft. If the language of the instruction is the gauge of the intent of the parties about bearing the risk of loss, it is inferentially limited by a paragraph of the instruction that says the Navy will not "have any responsibility or liability for the financial operation of such [banking] facility or for any losses, expenses, or claims for damages arising therefrom" and that the bank will indemnify defendant against any loss or claim to which it may be subjected by bank employees as a result of use and occupancy of the premises of the Navy. This obvious omission from the regulation of any reference to liability for loss by robbery, does not, however, bar the court from jurisdiction.

■ Plaintiff's petition pleads its claim in the alternative as either founded upon a regulation of an executive department or upon breach of an express contract. As defendant correctly says, there was no express contract here to compensate plaintiff for losses arising from the robbery. Plaintiff's brief, however, says that a contract to pay such a loss is "implied in fact" by the conduct of the parties and the surrounding circumstances in the case. The Court of Claims does have jurisdiction over disputes arising under contracts implied in fact. It has reiterated this recently in Algonac Mfg. Co. v. United States, 428 F.2d 1241, 192 Ct.Cl. 649 (1970). As in that case, the plaintiff here has not properly pleaded the implied contract but it will be considered since the argument has been made, and if such contract does exist it would arise under the regulation which is properly in issue. When an action is founded on an executive regulation, as here, or on an act of Congress, there need be no implied agreement with the United States as an independent ground for jurisdiction. "If the plaintiff asserts that his claim 'arises under' or is 'founded' on federal legislation or regulation * * * 'to determine whether that claim is well founded,' the court 'must take jurisdiction, whether its ultimate resolution is to be in the affirmative or the negative.' * * * It is 'well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction. * * *.'" Ralston Steel Corp. v. United States, 340 F.2d 663, 667, 169 Ct.Cl. 119, 125, cert. denied, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965). Since plaintiff's claim is not frivolous, but arguable, it will therefore be considered on its merits.

■ Did defendant fulfill its responsibilities under the instruction? Were additional legal responsibilities put upon it by its conduct and surrounding circumstances? The questions must be considered together.

The language of the instruction is clear. It required guards in three circumstances: (1) on paydays, (2) to accompany shipments of money from the parent bank, and (3) "at other times involving unusual circumstances as may be required to avoid undue risks or costs of insurance on the part of the banking facility. In this connection consideration should be given to overall security factors normally present." It is not necessary to consider the first two points because the robbery was not on a payday and there is no issue concerning whether defendant furnished a guard to accompany a shipment of money. It is the facts surrounding the third point that govern the case.

Plaintiff says there were "unusual circumstances" requiring guards, that these circumstances were pointed out to the defendant and guards were requested, but that defendant ignored the circumstances and the request. Although de-

fendant had furnished guards on all occasions prior to the week of the robbery, it considered that no threat existed during that week. The case must be judged not by hindsight but rather by whether the action taken, or not taken, at the critical time was reasonable under the information available upon which to predicate a decision then.

 Had a guard been posted on the day of the robbery and had the robbery taken place anyway, plaintiff would have no claim. There is nothing in the instruction which makes the Government the insurer of the bank or which suggests that it impliedly agreed to be an insurer. Where the evidence shows defendant would not have expressly agreed to such a provision, the contrary cannot be implied or imputed. Air Terminal Services v. United States, 330 F.2d 974, 978, 165 Ct.Cl. 525, 533, cert. denied, 379 U.S. 829, 85 S.Ct. 57, 13 L.Ed.2d 38 (1964). Presence of a guard would not inevitably have prevented the robbery. The evidence is that guards perhaps did discourage robbery on a prior occasion but a guarded bank can be robbed and presence of a guard is no absolute guarantee of safety. Had there been unusual circumstances, defendant would have done the most it was required to do by posting a guard. Absent a nexus between the defendant's action or inaction and the robbery, which is sufficient to establish proximate cause and causation in fact, defendant's liability for not posting a guard in the absence of "unusual circumstances" can be no greater than the liability which would have resulted if a guard had been posted and the robbery had, nevertheless, occurred.

A close case is relied upon by defendant where a burglar alarm system was installed with a contract to maintain it in proper working order. A burglar got in and committed a crime anyway. The party that contracted to furnish this protective service was held not responsible for the loss. This has long been the rule. "The proximate cause of the loss to the plaintiffs was not the alleged failure of the alarm to work, but the af-firmative act of third persons, acting in violation of the criminal laws of the state. * * * It may have failed to prevent the consummation of the crime, but the defendant never assumed the duty of doing this." Silverblatt v. Brooklyn Telegraph & Messenger Co., 150 App.Div. 268, 134 N.Y.S. 765, 769 (1912). " * * * an injury to be foreseeable must be the natural and proximate result of the breach. There must be no intervening efficient cause." Locke v. United States, 283 F.2d 521, 526, 151 Ct.Cl. 262, 270 (1960). Plaintiff contends that it is sufficient if the victim might have been saved by a precaution which the defendant negligently omitted where such omission is deemed to have caused the harm. The cases upon which plaintiff principally relies to support such a rule deal with those situations in which there was a direct causal connection between the loss and defendant's action, without intervention of third parties. They are not relevant to the situation here at issue.

In the week prior to the robbery defendant considered that the circumstances were unusual enough to justify a guard pending investigation of the circumstances. Following the investigation by three investigative groups, including the FBI, defendant concluded that the presence of one suspicious man had been satisfactorily explained. The other could not be identified. There was no hard evidence to suggest he might be a robber. There was no such evidence produced at the trial. That evidence showed the suspicious stranger was white; the robbers were black. The evidence did establish that the bank was not without security. Defendant had a rather elaborate security system within the buildings and on the grounds. It took this into consideration, as required by the instruction, when it decided not to furnish additional guards the week of June 24, 1968. In so exercising its discretion it acted in good faith and on the best credible evidence then available as to the presence of unusual circumstances posing undue risks to the bank. The

evidence is that the defendant always acted in good faith in these matters and that its relations with the bank were excellent. It posted extra guards when there was any serious evidence that it should do so. It was not required to keep them on duty indefinitely when there was no serious, apparent reason to do so, after giving consideration to overall security factors normally present. It is noted that the robbery did not take place for a week following the incident of June 18 and for 4 days after guards were removed. Further, as previously noted, there is no evidence to connect the incident to the robbery. Defendant cannot be held liable on the basis of speculation and suspicion.

■ The determination not to post guards during the week of June 24, 1968, was an administrative one and was an exercise of discretionary authority involving judgment reserved to defendant under terms of the regulation. Since the decision made cannot be said to have been arbitrary or capricious or in bad faith and did not exceed the bounds of authority, the court cannot substitute its judgment for that of the administrative officers. United States v. Shimer, 367 U.S. 374, 381–382, 81 S. Ct. 1554, 6 L.Ed.2d 908 (1961); Port Authority of the City of Saint Paul v. United States, 432 F.2d 455, 193 Ct.Cl. 108 (1970).

■ There remains the question of whether defendant ever explicitly or implicitly assured the bank that the guard would be provided on June 26, 1968, the day of the robbery. It is undisputed that the bank manager and its security officer requested guards on June 24, 25, and 26. Their requests were submitted to the hospital's security officer and plaintiff says that he promised the guards. He does not remember doing so and denies it. Since the evidence is clear that his superior, the administrative officer, had refused to authorize the guards he would not have had any authority to do otherwise. He well knew the limitations upon his authority as security officer. He relayed the requests to his boss but they died there. It is possible that the defendant's security officer and the bank personnel were talking about two different things. The defendant's security officer did assure the bank that the guard provided for paydays would be there at that time, as the instruction required. Any promise beyond his authority would be unenforceable here. Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947); Richards & Associates v. United States, 177 Ct.Cl. 1037, 1051 (1966).

In summary, plaintiff's claim must fail. Defendant fulfilled its responsibilities under the pertinent regulation or instruction. There was no implied contract to do more. The petition must be dismissed.