Joseph C. SAULQUE, Plaintiff-Appellant,

v.

UNITED STATES of America and Cecil Andrus, Secretary of the Interior, Defendants-Appellees.

No. 80–4078.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 13, 1981.

Decided Dec. 14, 1981.

---

Linda Anisman, Bishop, Cal., for plaintiff-appellant.

James E. White, Asst. U. S. Atty., Fresno, Cal., for defendants-appellees.

Before SKELTON *, Senior Judge, GOODWIN and NORRIS, Circuit Judges.

SKELTON, Senior Judge:

The appellant, Joseph C. Saulque, is a Paiute Indian. He filed an application on September 25, 1972, for an Indian allotment of 160.42 acres with the Bureau of Indian Affairs of the Department of Interior under the General Allotment Act of 1887 (25 U.S.C., §§ 334 and 336, as amended). The California State Director of the Bureau of Land Management issued an initial decision on April 30, 1974, classifying the 160.42 acres as unsuitable as agricultural land for disposal under the General Allotment Act. Saulque appealed from this decision to the Department of Interior on the basis that the lands were well suited for agriculture and submitted evidence in support of his petition-application. The Department then conducted an extensive survey and prepared an official land report on the facts. On December 5, 1975, the State Director's decision was affirmed and appellant's application was again denied by the Secretary of Interior.

Appellant then filed a complaint for declaratory relief pursuant to 28 U.S.C. §§ 2201–2202, in Federal District Court, Eastern District of California, asserting

among other things that the Secretary's action was arbitrary and capricious. Both appellant and respondent filed motions for summary judgment, and on December 26, 1979, the court found that the Secretary had properly denied appellant's application and accordingly denied appellant's motion and entered judgment for the respondent. Thereafter, appellant filed this appeal. We affirm.

The government assumes for the purposes of this appeal that the facts stated in appellant's brief are substantially correct. They are generally as follows:

In 1972, while a student in Brigham Young University in Utah, appellant Saulque became aware of several parcels of vacant land located in the Owens Valley, Inyo County, California. Some of these parcels were mentioned in a letter dated April 1, 1913, from the Assistant Commissioner of Indian Affairs of the General Land Office, Department of Interior, to the Register and Receiver, Independence, California, as follows:

> Sirs:
>
> March 21, 1913, the Department approved the recommendation of the Second Assistant Commissioner of Indian Affairs to the effect that the land in the E ½ NE ¼, NW ¼ NE ¼, N ½ NW ¼, E ½ SE ¼ Sec. 6, T. 8 S., R 33E.; and the N ½ NW ¼, W ½ SW ¼, Sec. 25, S ½, S ½ N ½ Sec. 35, T. 14 S., R. 35 E., MDM., be temporarily suspended from entry, until a further report can be submitted with a view to having an additional executive order issued withdrawing such other land as may be available and needed for the homeless Indians living in Inyo and Mono Counties, California.
>
> You are, therefore, directed to make proper notations thereof on your records.
>
> Very respectfully,
>
> /S/
>
> Assistant Commissioner

---

* The Honorable Byron G. Skelton, Senior Judge of the United States Court of Claims, sitting by designation.

On March 18, 1972, Mr. Saulque wrote to Robert N. Seitz, Area Realty Officer of the Bureau of Indian Affairs, to inquire about the status of these various parcels of land, including those parcels described in the letter of April 1, 1913. Receiving an incomplete reply, Mr. Saulque again wrote to Mr. Seitz on July 12, 1972. On July 19, 1972, Mr. Saulque received the following reply from Mr. Seitz:

> Dear Mr. Saulque:
>
> This is in reply to your letter of July 12 regarding certain lands in Inyo County, described below, which were temporarily withdrawn on March 21, 1913, for use of homeless Indians living·in Inyo and Mono Counties:
>
> Lots 3, 4, E ½ SE ¼ section 6, T. 8 S, R. 33 E., M.D.M., California, containing 160.42 acres.
>
> N ½ NW ¼, W ½ SW ¼ section 25, N ½ S ½, SW ¼ SW ½, SE ¼ SE ¼, Section 35, all in T. 14 S., R. 35 E., M.D.M., California, containing 400.00 acres.
>
> The above-described lands, aggregating 560.42 acres, are still in a withdrawn status.
>
> Sincerely yours,
> (SGD) Robert N. Seitz
> Robert N. Seitz
> Area Realty Officer

On September 25, 1972, Saulque applied for an allotment of the following described land:

> Lots 3, 4, E ½, SE ¼, Section 6, T. 8 S., R. 33 E., M.D.M., CA, containing 160.42 acres.

After completing his education, he returned to California, and on approximately February 1, 1974, he and his family settled on the applied-for land and began to make improvements, including installing a mobile home trailer and planting a 20′ × 20′ garden and ten trees.

On May 3, 1974, Saulque's attorney, Edward Forstenzer, wrote to the District Manager of the Bureau of Land Management to inform him that Saulque had settled on the land, and to request that the application be treated as an application for an allotment pursuant to 25 U.S.C. § 336, as well as 25 U.S.C. § 334. Again, on May 9, 1974, his attorney corresponded with the District Manager to clarify the fact that Saulque's application had been amended to include Lots 3 and 4.

The Bureau of Land Management of the Department of Interior made an investigation and survey of the land in question and prepared an official land report containing the facts, which was filed and made available to Saulque and the public in the state office in Bakersfield, California. Based on the facts contained in the report, the State Director issued a decision on April 30, 1974, denying Saulque's petition for the following reasons:

> The land cannot be classified as suitable for disposal under the Indian Allotment Act for the following reasons:
>
> 1. The land is not suitable for the growing of cultivated crops. Sandy, rocky soils low in organic matter and water-holding capacity, boulders and uneven terrain cut by gullies, and lack of water preclude any reasonable possibility of a farming operation.
>
> 2. The anticipated return from agricultural use of the land would not support the residents. The only use which could be made of the land is grazing. This land was rated in a 1969 range survey at 22 acres per A.U.M., which means that 264 acres would be needed to support one cow for one year. This parcel would only support one cow for less than four months per year.

> The following petition-application is not approved:
>
> Serial Number: S 5525
> Applicant: Joseph C. Saulque

Following the denial of Saulque's application for allotment by the State Director, he pursued his administrative remedies in the Department of Interior. During the administrative proceedings, Saulque presented his affidavit in which he stated that the land was suited for agricultural purposes and was similar to six other tracts in the area

that had been allotted. He also submitted affidavits of two real estate appraisers and a feasibility study made by them to the effect that the land in question was suitable for agriculture. Saulqué also filed a letter to the same effect from the County Director and Farm Advisor for the University of California Extension Service in Inyo and Mono Counties.

With the issues thus joined, the Secretary of the Interior made findings of fact and issued a final decision on December 5, 1975, affirming the decision of the State Director and denying Saulque's application, in pertinent part, as follows:

The General Allotment Act of February 8, 1887, as amended (25 U.S.C. 334), under which Mr. Saulque's application was filed, provides that allotments may include not to exceed 40 acres of irrigable land, 80 acres of nonirrigable agricultural land, or 160 acres of nonirrigable grazing land. Irrigable lands are those susceptible of successful irrigation at a reasonable cost from any known source of water supply; nonirrigable agricultural lands are those upon which agricultural crops can be profitably raised without irrigation; grazing lands are those which cannot be profitably devoted to any agricultural use other than grazing. Under any of these categories, the lands must be capable of providing the support of a family or, in other words, must constitute an economic family unit.

Our view of the record disclosed that the lands concerned do not fulfill these requirements of the law and regulations. The climate of the area is very arid and agricultural crops cannot be successfully produced without irrigation. Only 10 acres of the lands are both irrigable and cultivable. These lands will not provide an economic family unit as intended by the homestead and Indian allotment laws. In these circumstances, we can find no basis upon which to modify or vacate the State Director's initial decision, and said decision is hereby affirmed. This constitutes the final action of the Department in this matter.

Thereafter, Saulque appealed the Secretary's final denial of his petition by filing a suit for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 in the District Court for the Eastern District of California. In his suit, Saulque makes the same claims that he made in the administrative proceedings that the land was suitable for agriculture. He also claims that the denial of his application by the Department of Interior was arbitrary, capricious and an abuse of discretion and contrary to the intent and purpose of the General Allotment Act of 1887. Saulque also says that the government should be estopped from denying his application because an agent of the government represented to him that the land was available for settlement by homeless Indians and his detrimental reliance thereon.

The district court made findings and held on the issues of arbitrariness and capriciousness of the agency action and on the suitableness of the land for agriculture, as follows:

The Court has resolved the questions whether the administrative agency acted in an arbitrary and capricious manner, in disregard of substantial evidence, or not otherwise in accordance with the law, and has made the following findings.

It is the finding of this Court that the Secretary of the Interior in making the agency decision considered all relevant factors regarding the capability of the subject land for settlement, including irrigability of the soil, soil content, crop production capability, and grazing capability. The allegations of arbitrariness and capriciousness, are thereby, wholly unsupported by the evidence.

It is further the finding of this Court that substantial evidence exists supporting the agency's finding that the subject land is not suitable for settlement by homeless Indians under the General Allotment Act. This finding is based upon the voluminous records prepared by the Bureau of Land Management during the Bureau's investigation of this matter.

On the estoppel issue, the court said that equitable estoppel as applied against the

government is often limited by the doctrine of sovereign immunity, citing *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9 Cir. 1970). The court held that in denying Saulque's application for an allotment the government was exercising its sovereign role as protector of public lands and was not acting as a private concern, and, therefore, equitable estoppel cannot be applied.

The court granted the government's motion for summary judgment and this appeal followed.

The government contended in the district court, and now contends in this court, that the Taylor Grazing Act of 1934 (43 U.S.C. §§ 315–315g, 315h–315m, 315n, and 315o–1) and Executive Order No. 6910, bar the claim of Saulque. That Act and the Executive Order withdrew all lands of public domain in the Western United States not already withdrawn from allotment and reserved them for grazing. The only lands not covered by the Act and Order were those lands which had been previously withdrawn. The government says that the Act and Executive Order of 1934 withdrew the lands in question from allotment long before Saulque filed his petition for same in 1972. Saulque counters by contending that the letter of April 1, 1913 (quoted above) from the Assistant Commissioner of Indian Affairs to the Registrar and Receiver of Inyo County indicates that there had been a valid withdrawal of the land prior to that date by the Department of Interior, although he admits that the letter itself was neither a withdrawal nor an executive order of the Secretary of the Interior. Saulque argues, therefore, that since the land had been withdrawn, it was not covered by the Taylor Grazing Act and was subject to allotment under the General Allotment Act of 1887. Congress mandated a specific procedure for the withdrawal of land from the public domain (Act of June 25, 1910; 36 Stat. 847; 43 U.S.C. §§ 141–143, 16 U.S.C. § 471; 43 C.F.R. 2300.0, et seq.).

Section 141—Withdrawal and reservation of lands for water-power sites or other purposes states:

The President may, at any time in his discretion, temporarily withdraw from settlement, location, sale, or entry any of the public lands of the United States, including Alaska, and reserve the same for water-power sites, irrigation, classification, of lands, or other public purposes to be specified in the orders of withdrawals, and such withdrawals or reservations shall remain in force until revoked by him or by an Act of Congress.

June 25, 1910, c. 421, Section 1, 36 Stat. 847.

The authority thus given to the president in 1910 was not changed until 1943 when Executive Order 9337 was issued delegating the power to withdraw land to the Secretary of Interior. This Order was superseded by Executive Order 10355 of 1952 to the same effect, in pertinent part, as follows:

EXECUTIVE ORDER No. 10355

May 26, 1952, 17 F.R. 4831

DELEGATION OF AUTHORITY

Section 1. (a) Subject to the provision of subsections (b), (c), and (d) of this section, I hereby delegate to the Secretary of the Interior the authority vested in the President by section 1 of the act of June 25, 1910, ch. 421, 36 Stat. 847 (43 U.S.C. 141) [this section], and the authority otherwise vested in him to withdraw or reserve lands of the public domain and other lands owned or controlled by the United States in the continental United States or Alaska for public purposes, including the authority to modify or revoke withdrawals and reservations of such lands heretofore or hereafter made.

\* \* \* \* \* \*

Sec. 4. This order supersedes Executive Order No. 9337 of April 24, 1943, entitled "Authorizing the Secretary of the Interior to Withdraw and Reserve Lands of the Public Domain and Other Lands Owned or Controlled by the United States."

The government contends that prior to the issuance of these Orders, only the President

could withdraw lands of the public domain. Saulque contradicts this assertion and says a withdrawal of land by the Secretary is valid because it is done under presidential authority. He quotes from our decision in *United States v. Consolidated Mines & Smelting Co., Ltd.*, 455 F.2d 432 (9 Cir. 1971), as follows:

> In law, the Secretary's withdrawal is an act of the President. At present this relationship is explicit. Executive Order No. 10355, May 26, 1952, 17 F.R. 4831, superceding Executive Order No. 9337, April 24, 1943, delegated the President's power to withdraw land under the Pickett Act or other authority to the Secretary. Even before this delegation the Secretary's withdrawals were considered acts of the president. *Wolsey v. Chapman*, 101 U.S. (XI Otto) 755, 25 L.Ed. 915 (1879); *Wilcox v. Jackson*, 38 U.S. (13 Pet.) 498, 513, 10 L.Ed. 264 (1839). 455 F.2d at 442.

However, this argument is of no help to Saulque, because the letter of April 1, 1913, on which he relies was not the act of the Secretary but was merely a communication from a low-level officer of the Department who is not shown to have had the authority to withdraw lands of the public domain. The Supreme Court held in *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947):

> [A]nyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority. 332 U.S. 384, 68 S.Ct. 3, 92 L.Ed. 15.

The Supreme Court clearly held in that case that the government is not bound by the unauthorized acts of its agents. *See also,* State of Arizona v. United States*, 216 Ct.Cl. 221, 575 F.2d 855 (1978). Furthermore, one who relies on the act of a government agent must show that the agent acted within his authority. *See Housing Corp. of America v. United States*, 199 Ct.Cl. 705, 468 F.2d 922 (1972). In that case, the court held:

> * * * The United States is not bound by the unauthorized acts of its agents.

Here, assuming that plaintiff's recollection of events is correct, it has not shown that Sabella and Brown acted within their authority. It is plaintiff's responsibility to make such a showing and plaintiff is deemed to have notice of their limited authority. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 [68 S.Ct. 1, 3, 92 L.Ed. 10] (1947); *National Bank of N. America v. United States*, 197 Ct.Cl. 948, 456 F.2d 754 (1972); *California-Pac. Util. Co. v. United States*, 194 Ct.Cl. 703 (1971); *Fountain v. United States*, 192 Ct.Cl. 495, 427 F.2d 759 (1970), cert. denied, 404 U.S. 839 [92 S.Ct. 131, 30 L.Ed.2d 73] (1971); *Miami Metropolitan Bldg. Corp. v. United States*, 180 Ct.Cl. 503 (1967). 199 Ct.Cl. at 711–712, 468 F.2d 922.

*See also, Morris v. Andrus*, 593 F.2d 851 (9 Cir. 1978).

■ In the instant case there is no evidence that the agent who wrote the letter of April 1, 1913, had the authority to withdraw the land in question from the public domain. Saulque had the burden of proving that the agent had such authority, and he wholly failed to meet this burden. Neither did he prove that any other official of the government who had authority to withdraw land of the public domain actually withdrew the land in question prior to the enactment of the Taylor Grazing Act in 1934 when all land in the Western United States not previously withdrawn was withdrawn and was no longer available for allotment.

In the case before us, it makes no difference whether the land was withdrawn under the General Allotment Act of 1887 prior to or on April 1, 1913, as Saulque contends, or by the Taylor Grazing Act and Executive Order 6910 in 1934, because Saulque is not entitled to judgment on the merits in either case. It is clear that if the land was withdrawn under the Taylor Grazing Act and the Executive Order, Saulque could not prevail as no public domain land could thereafter be allotted, so it is not necessary for us to discuss those measures further.

Saulque filed his application under the General Allotment Act and it was processed administratively under the provisions of that Act and under applicable regulations. The Act provides, among other things, that the President is authorized to:

[c]ause allotment to each Indian as in his opinion may be for their best interest * * *. 25 U.S.C. § 334, as amended 25 U.S.C. § 331.

The Department of Interior has established and promulgated standards and regulations under this statute whereby land is available for allotment to Indians only if it is suitable for agricultural purposes, is suitable for a home for the Indian and his family, and the return from the use of the land would support the residents. In this regard, 43 C.F.R. 2430.5(f) provides:

(f) Lands outside of Alaska may be classified as suitable for Indian allotment under Part 2530 of this chapter if (1) the lands are valuable for agricultural purposes, and (2) the lands are on the whole suitable for a home for an Indian and his family, and (3) the anticipated return from agricultural use of the land would support the residents, and (4) the requirements for water supplies set forth in § 2430.5(d) are met.

The evidence in this case, as shown by the findings of the State Director and the Secretary and by the district court, reveal that the land in question does not meet these requirements. These findings show that the land is not suitable for growing cultivated crops. It has sandy and rocky soils low in organic matter and water-holding capacity, boulders and uneven terrain cut by gullies, and its lack of water preclude any reasonable possibility of a farming operation. The anticipated return from agricultural use of the land would not support the residents. The only use which could be made of the land is grazing. In that regard, 264 acres would be required to support one cow for one year. The parcel involved would only support one cow for less than four months per year.

These findings are supported by substantial evidence and are not clearly erroneous.

Accordingly, we conclude that the denial of Saulque's application by the Secretary was proper and was neither arbitrary nor capricious nor an abuse of discretion, and was in accordance with the General Allotment Act of 1887 and the regulations pursuant thereto.

Saulque says that the allotment should have been granted to him because of the trust relationship between the government and Indians. It should be obvious that this trust relationship was the very reason why neither Congress nor the President would allow an allotment of land to be granted to an Indian where the land was not fit for agriculture and would not support the Indian and his family. To do otherwise would result in great hardship and injustice to the Indian and his dependents.

The appellant points out that an allotment of similar land in the same area was made by the government to one Anthony Fred. He argues that this shows that his land was subject to allotment and also that his land was suitable for agricultural purposes. The government says that the allotment to Fred was obviously a mistake by the Department, but that it was not required to perpetuate the mistake in other allotments, citing *Bornstein v. United States*, 170 Ct.Cl. 576, 345 F.2d 558 (Ct.Cl. 1965). There the court held that the Commissioner of IRS could change his legal opinion and position to correct an error of law made in a prior case. We conclude that the Secretary could also change his opinion and position in this case in order to comply with the law. *Also see United States v. Gross*, 451 F.2d 1355 (7 Cir. 1971). As to the Fred allotment being proof that the land Saulque applied for was suitable for agriculture, we hold that if it was material or relevant to that issue, it was not sufficient to overcome the evidence and the findings in the record that the land was not suited for such purpose.

Finally, Saulque says that the government should be estopped from denying his application because its agent, Robert N. Seitz, Area Realty Officer, represented

to him on July 10, 1972, that the land applied for had been withdrawn from the public domain and was open for allotment by homeless Indians. He alleges that he relied on such representations, moved on the land, made improvements and applied for an allotment, and that he will suffer great hardships if the allotment is not granted.

■■ Estoppel is not applicable against the government in this case for several reasons. In the first place, there is no evidence in the record that Seitz had any authority with regard to the withdrawal of land of the public domain. Consequently, we must assume that he acted without authority in representing to Saulque that the land was in a withdrawn status. It is well settled that estoppel cannot be invoked against the government because of the unauthorized acts of its agents. In the leading case on equitable estoppel against the government, *Utah Power & Light Co. v. United States*, 243 U.S. 389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791 (1916), the Supreme Court held:

> [T]he United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.
>
> \*　\*　\*　\*　\*　\*
>
> A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it.

In *United States v. California*, 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947), the Supreme Court said:

> The government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property; and officers who have no authority at all to dispose of Government property cannot by their conduct cause the Government to lose its valuable rights by their acquiescence, laches, or failure to act.

See also *United States v. Georgia-Pacific Co.*, 421 F.2d 92 (9 Cir. 1970); *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10, 175 A.L.R. 1075 (1947); *Beaver v. United States*, 350 F.2d 4, 8 (9 Cir. 1965), *cert. denied*, 383 U.S. 937, 86 S.Ct. 1067, 15 L.Ed.2d 854 (1966); and *United States v. Cappaert*, 508 F.2d 313 (9 Cir. 1974), *aff'd*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976). We held in *Union Oil Co. of California v. Morton*, 512 F.2d 743, 748 (9 Cir. 1975) that "we are very reluctant to apply estoppel against the government in cases involving rights to public land," citing the *Beaver* and *Cappaert* cases, *supra*.

■ In the next place, estoppel is not applicable against the government here because in denying Saulque's application it was acting in its sovereign capacity in the exercise of its sovereign powers, and, under such circumstances, equitable estoppel cannot be invoked against it. In *United States v. Georgia-Pacific Co., supra*, we held:

> \* \* \* The Government, in its caretaker role for all the public, should not be bound by the unauthorized or unlawful acts of its representatives.
>
> \*　\*　\*　\*　\*　\*

Thus the courts have held that an equitable estoppel may be found against the Government (1) if the Government is acting in its proprietary rather than sovereign capacity; and (2) if its representative has been acting within the scope of his authority.

(1) While it is said that the Government can be estopped in its proprietary role, *but not in its sovereign role*, the authorities are not clear about just what activities are encompassed by each. In its proprietary role, the Government is acting as a private concern would; in its sovereign role, the Government is carrying out its unique governmental functions for the benefit of the whole public.

\*　\*　\*　\*　\*　\*

(2) We must also ask whether Assistant Secretary of the Interior Sherman, in issuing P.L.O. 1600 in 1958, *was acting beyond the scope of his authority, thus rendering such Order ineffective to bind the Government* under the principles discussed above. (Emphasis supplied). 421 F.2d at 100–101.

Finally, estoppel is inapplicable because Saulque was not misled by Seitz's letter. This is shown by the fact that when he filed his application he enclosed a cover letter which stated:

> I understand that two other Indians have applied for this same land, according to Mr. Rolfe of the Bureau of Indian Affairs, Sacramento area office. In addition, he said that he did not think that we would get the land. This may be true, but I'm not ready to give up so easy. I'm prepared to take it to court if necessary.

This letter shows that Saulque knew when he filed his application that he had little chance of getting the allotment. It also shows that he had full knowledge of the facts and that he acted with his eyes open and that he was not misled by Seitz's letter.

█ Saulque contends that he is entitled to the allotment because he moved on the land and is in possession and has made improvements to it. This is of no help to him. In fact, his actions in this regard made him a trespasser on government land. In this regard, 43 C.F.R., § 2450.7 provides:

> § 2450.7 Right to occupy or settle.
> The filing of a petition-application gives no right to occupy or settle upon the land. A person shall be entitled to the possession and use of land only after his entry, selection, or location has been allowed, or a lease has been issued. Settlement on the land prior to that time constitutes a trespass.

The letter from the Secretary dated December 5, 1975, finally denying Saulque's application notified him that he was a trespasser in the following language:

> Mr. Saulque's occupancy of the land is a trespass against the United States and cannot be considered a basis for modifying the classification decision.

\*       \*       \*       \*       \*       \*

We are directing the Director of the Bureau of Land Management to take appropriate administrative action to resolve Mr. Saulque's unauthorized occupancy.

We hold that the judgment of the district court affirming the decision of the Secretary of Interior denying Saulque's application for an allotment of public lands was correct, and it is hereby affirmed.

AFFIRMED.