**David H. GREENWALD and Audrey Greenwald, Plaintiffs,**

v.

**Herbert OLSEN, as Superintendent of the Cape Cod National Seashore, and James Watt, as Secretary of the United States Department of Interior, Defendants.**

Civ. A. No. 81–2558–T.

United States District Court,
D. Massachusetts.

April 5, 1984.

James M. Hughes, Devin & Drohan, Hingham, Mass., for plaintiffs.

Asst. U.S. Atty. Joseph McGovern, Boston, Mass., for defendants.

## MEMORANDUM

TAURO, District Judge.

Plaintiffs, Audrey and David Greenwald, own an ocean-front summer cottage within the boundaries of the Cape Cod National Seashore ("the Seashore").[1] Their cottage is in danger of being demolished because of the progressive land erosion caused by the ebb and flow of the ocean tide. That threat caused plaintiffs to seek an "exchange agreement" with the federal government under which they would trade their ocean-front property for a more secure, inland parcel owned by the federal government.[2] The defendant federal officials have refused to enter into an exchange program. Because of that refusal,

---

1. The Cape Cod National Seashore was created by Pub.L. 87–126 § 1, 75 Stat. 284 (1961), *codified at* 16 U.S.C. § 459b *et seq.* (1974).

2. The Cape Cod National Seashore Act authorizes the Secretary of the Interior to acquire property within the Seashore by exchanging federally owned land for privately held parcels. *See* 16 U.S.C. § 459b–1 (1974).

plaintiffs bring this action to compel the requested land exchange.

## I.

## THE FACTS

The Greenwalds' cottage, located in Eastham, Massachusetts, is a "detached, one family dwelling" that was constructed prior to 1940. It qualifies as an "improved property" under the Cape Cod National Seashore Act ("the Act"). *See* 16 U.S.C. § 459b–3(d) (1974). The Act provides that an improved property is perpetually exempt from condemnation if the town in which the property is located has a zoning bylaw approved by the Secretary of the Interior. *See* 16 U.S.C. § 459b–3(b)(2). Eastham has enacted a zoning bylaw approved by the Secretary.

Prior to 1978, Edith Conzett owned the Greenwald property. During late 1977 and 1978, Conzett communicated with officials of the Cape Cod National Seashore concerning an exchange of her land for a more secure, federally-owned parcel. Seashore officials responded positively to Conzett's overture and, in November 1978, they provided Conzett with a map designating a federal parcel that would be available for exchange.

The exchange never took place. Conzett informed federal officials in late November 1978, that she was no longer interested in an exchange because she had decided to sell her property. The prospective purchasers were the Greenwalds.

The Greenwalds learned that the cottage was for sale through Mercia Bull, Audrey Greenwald's aunt, who also owns a cottage in the area. In September 1978, Ms. Bull learned that Conzett wanted to sell her property. Realizing that her niece might be interested, Ms. Bull made some inquiries about the property and provided the Greenwalds with the information she gathered.

One of Ms. Bull's inquiries was to officials of the National Seashore. A long-time resident of the Seashore, Ms. Bull realized that the Conzett cottage was in grave danger due to erosion. According to Ms. Bull's testimony, Lawrence Hadley, then Superintendent of the Seashore, assured her that any purchaser of the Conzett property would be able to arrange an exchange with the federal government for a more secure parcel.

Prompted by Ms. Bull's communication, the Greenwalds traveled to Cape Cod to view the Conzett property in late September or early October 1978. After seeing the property, the Greenwalds decided that they were interested in purchasing, provided that an exchange agreement could be reached with the federal government. They went to the National Seashore Office in Wellfleet to inquire about exchange possibilities. James Killian, Director of Environmental Planning for the Seashore, assured the Greenwalds that an exchange could be arranged. Mr. Killian even described a specific federal parcel that would be available.[3]

On October 5, 1978, Ms. Greenwald sent a letter to Superintendent Hadley inquiring about the procedures and requirements for an exchange. Although Ms. Greenwald described the property she wanted to buy, Seashore officials apparently did not realize she was contemplating an exchange for the Conzett property.[4] On October 12, 1978, Superintendent Hadley responded to Ms. Greenwald with a letter stating: "Should you decide to purchase the property described in your letter we would be pleased to enter exchange negotiations with you."

At about this same time, the Greenwalds signed a purchase and sale agreement with Conzett. Due to title problems, however, the transaction was not consummated until over a year later, in October of 1979. The purchase price was $35,000.00.

---

**3.** The significance of these statements by Mr. Killian is reduced by the fact that Ms. Greenwald knew that Mr. Killian did not have authority to commit the government to an exchange.

**4.** In fact the October 5, letter from Ms. Greenwald was filed with documents relating to a different tract of land.

When the Greenwalds opened their cottage in the spring of 1980, they realized that additional erosion had occurred. Ms. Greenwald telephoned Mr. Killian on June 2, 1980 to initiate a land exchange. Mr. Killian informed her that, since their last conversation, the Seashore had adopted a new land acquisition policy.[5] Mr. Killian also told Ms. Greenwald that her request for an exchange should be directed, in writing, to Herbert Olsen, the new Seashore Superintendent.

Indeed, significant changes in federal land acquisition policy had occurred in 1979 and early 1980. In April 1979, the Department of the Interior adopted a new national policy on land acquisition.[6] Between the summer of 1979 and the spring of 1980, the Superintendent of the Seashore developed a local land acquisition policy ("LAP") for the Cape Code Seashore. This local LAP was adopted by the Seashore Advisory Commission on March 7, 1980.[7]

The LAP for the Seashore set out three administrative determinations that must be made prior to an exchange: (1) the properties to be exchanged must be approximately equal in value; (2) the Secretary must be willing to make the exchange; and (3) the Secretary must deem the property to be acquired more important for the Seashore than that being exchanged. *See* A.R. at 109.[8] Moreover, the new LAP specifically addressed the question of exchanges involving residential properties threatened by

erosion: "[t]he use of the exchange authority to relocate private properties from hazardous to other areas within the Seashore ... where no seeming benefit accrues to the United States are [sic] generally not permissible under authorizing legislation." A.R. at 120.[9]

At Mr. Killian's suggestion, Ms. Greenwald wrote to Superintendent Olsen on June 5, 1980. She explained that she had been assured in 1978 that federal land would be available for exchange. Olsen responded on June 9, stating that defendants considered the 1978 negotiations closed as of November 12, 1978, when Conzett rejected the government's offer. Moreover, Olsen indicated that the requested exchange would be contrary to the Seashore's new land acquisition policy.

Plaintiffs had further meetings with government officials throughout the summer and fall of 1980. They confronted defendants with the October 12, 1978 letter from Superintendent Hadley, which stated that the government "would be pleased to enter exchange negotiations." Despite this letter, defendants persisted in their refusal to enter into an exchange.

Finally, in 1981, plaintiffs filed this action asserting three theories of recovery. First, plaintiffs claim that they did not receive proper notice of the change in the Seashore's land acquisition policy. *See* Administrative Procedure Act, 5 U.S.C.

**5.** During this phone conversation, defendants first realized that the Greenwalds had purchased the Conzett property. Prior to the conversation, defendants thought Ms. Greenwald was interested in exchanging another parcel.

**6.** This policy was described in the Federal Register. *See* 44 Fed.Reg. 24790 (April 26, 1979).

**7.** Defendants observed numerous procedural safeguards in the adoption of the LAP for the Seashore. In February 1980, a copy of the proposed policy was sent to all known landowners within the Seashore. At about the same time, defendants issued a press release describing the new policy and inviting public comment. Finally, notice of the new policy was published in the Federal Register. *See* 45 Fed.Reg. 10042 (Feb. 14, 1980).

Plaintiffs did not receive a copy of the new LAP during the February 1980 mailing because

the mailing list of landowners within the Seashore was prepared in September 1979. Plaintiffs did not become owners of record until October 1979.

**8.** All references to the Administrative Record filed by the Secretary of the Interior shall be designated by "A.R."

**9.** This new policy has affected dramatically the Seashore's practice regarding exchanges for properties threatened by erosion. Prior to the new policy, the Seashore entered into a number of exchanges involving property threatened by erosion. Since the new plan was adopted, five owners of improved property have requested exchanges to relocate their homes from hazardous areas. Defendants have denied all of these requests.

§ 553(b) (1977). Second, plaintiffs argue that one of the main policies behind the Cape Cod National Seashore Act is the protection of owners of "improved property" within the Seashore. *See* 16 U.S.C. § 459b–3(b)(1). According to plaintiffs, this policy means that the Secretary's exchange authority must be exercised so as to preserve improved properties. Third, plaintiffs contend that the Secretary's decision was arbitrary and capricious. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). These theories will be discussed seriatim.

## II.

### NOTICE

The Administrative Procedure Act ("APA"), imposes certain notice requirements before an agency may enact or change one of its rules. Notice of the proposed rule must be published in the Federal Register, unless the persons to be affected get actual notice of the proposed action. 5 U.S.C. § 553(b) (1977).

In the instant case, plaintiffs' counsel has conceded that publication in the Federal Register was not necessary prior to the adoption of the Seashore's LAP. *See* Tr. at 2–12.[10] Plaintiffs argue, however, that defendants had an obligation under section 553(b) to provide actual notice of the new LAP to the Greenwalds.

As a preliminary matter, there is a serious question whether the requirements of section 553(b) applied to the adoption of the new LAP. The APA specifically provides that the notice requirements do not apply

to the adoption of "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice ...." 5 U.S.C. § 553(b)(A); *see also* K. Davis, *Administrative Law Treatise*, § 7.5 (2d ed. 1975).

■ The land acquisition policy adopted by the Seashore was a general statement of policy. As one court has noted,

a critical test of whether a rule is a general statement of policy is its practical effect in a subsequent administrative proceeding: a general statement of policy ... does not establish a binding norm .... it leaves the administrator free to exercise his informed discretion ...."

*Guardian Fed. Sav. and Loan v. Federal Sav. and Loan Ins. Corp.*, 589 F.2d 658, 666 (D.C.Cir.1978). In practical terms, the LAP merely set forth three factors to be considered by the Secretary in exercising his discretionary exchange authority. Even the LAP's statement concerning exchanges of private properties located in hazardous areas, *see supra* p. 1005, is phrased in very general terms, leaving much room for the exercise of administrative discretion in a particular case. Given that the LAP is only a general statement of policy, the Department of Interior and the Seashore were not bound by the requirements of section 553(b).[11]

■ Even assuming that the requirements of section 553(b) were applicable, that section would not support plaintiffs' claim of entitlement to "actual notice." The only mention of "actual notice" in section 553(b) is in a clause that creates an exception to the requirement of notice in

---

**10.** It appears that plaintiffs may have completely abandoned their claim of inadequate notice. Plaintiffs' proposed findings of fact and conclusions of law submitted after trial make no mention of the notice issue.

**11.** Assuming that section 553(b) did not apply in the instant case, defendants' mailing of the new LAP to landowners within the Seashore was completely voluntary. This voluntary undertaking did not impose upon defendants an obligation to constantly update their mailing list. *See generally, Superior Oil Co. v. Federal Energy Regulatory Comm'n,* 563 F.2d 191, 201 (5th Cir.

1977) (court should defer to agency's choice as to procedures beyond those required by the APA); *cf. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 529, 98 S.Ct. 1197, 1204, 55 L.Ed.2d 460 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them ...."). *But see Rodway v. United States Dept. of Agriculture,* 514 F.2d 809 (D.C. Cir.1975) (agency bound by own regulation requiring notice beyond that required by the APA).

the Federal Register. This clause was inserted only "to avoid burdening the Federal Register with notices addressed to particular parties who have been personally served or otherwise have notice . . . ." *See* K. Davis, *Administrative Law Treatise,* § 6:25 at 571, *quoting Attorney General's Manual on the APA* (1947). This clause does not grant plaintiffs a right to actual notice.

### III.

### POLICY FAVORING IMPROVED PROPERTIES

In passing the Cape Cod National Seashore Act, Congress showed some concern for the private property interests of landowners within the boundaries of the Seashore. For example, 16 U.S.C. § 459b–3 provides that the "Secretary's authority to acquire land by condemnation shall be suspended with respect to all improved property . . . ." [12] Moreover, the legislative history of the exchange provision of the Act, 16 U.S.C. § 459b–1(a) states:

> The purpose of this provision is to make it possible for a property owner within the Seashore who wishes to stay in the Seashore, but to change his location therein, to do so, assuming there is Seashore property which the Secretary is willing to exchange with him.

S.Rep. No. 428, 87th Cong., 1st Sess. (1961) *reprinted in* 1961 *U.S.Code Cong. & Ad. News* 2212, 2230.

Plaintiffs contend that the Act, read in the light of this legislative history, mandates that the Secretary enter into exchange transactions aimed at the preservation of pre-1959 dwellings. In other words, plaintiffs argue that the Secretary's decision not to enter into an exchange for the Greenwald property was contrary to a statutory directive because the decision will lead to the destruction of a pre-1959 dwelling.

12. As noted above, *see supra* p. 1004, an improved property is one on which a dwelling was constructed prior to September 1, 1959. *See* 16

It is true that, when creating the National Seashore, Congress was concerned with the interests of landowners. But its overriding goal was the preservation of the natural beauty of Cape Cod. As Judge Caffrey has noted, "although Congress recognized the value of retaining a human element within the Seashore, it was not willing to do so at the expense of unique scenic, scientific and historic features of the region . . . ." *United States v. Certain Lands in Truro,* 476 F.Supp. 1031, 1033 (D.Mass.1979).

When discussing the exchange authority, Congress indicated that exchanges are permissible "assuming there is Seashore property which the Secretary is willing to exchange . . . ." 1961 *U.S.Code Cong. & Ad. News* at 2230. This court, therefore, believes that the Act does not require the Secretary to enter into an exchange for every pre-1959 dwelling imperiled by the natural forces of erosion. Rather, the Act permits the Secretary to make such an exchange if he determines it to be in the best interests of the Seashore.

### IV.

### THE SECRETARY'S DECISION

In *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court held that informal fact finding by an administrative agency was subject to judicial review under an "arbitrary and capricious" standard. *See* 5 U.S.C. § 706 (1977). In the instant case, plaintiffs argue that the court should apply this standard of review to defendants' decision not to enter into the requested exchange.

*Overton Park,* however, recognizes an exception to the rule that agency decisions should not be subject to judicial review. Specifically, the Supreme Court noted that section 701(a)(2) of the APA, 5 U.S.C. § 701(a)(2), exempts from judicial review decisions "committed to agency discretion."

U.S.C. § 459b–3(d). Plaintiffs' property is an improved property.

*See Overton Park*, 401 U.S. at 410, 91 S.Ct. at 820; *Dugan v. Ramsay*, 727 F.2d 192, at 195–196 (1st Cir.1984). While this exception is admittedly narrow, it clearly applies where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Id., quoting* S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945).

■ The Cape Cod National Seashore Act grants the Secretary of the Interior almost unlimited discretion with regard to land exchanges. *See* 16 U.S.C. § 459b–1(a). In fact, the only statutory limitation on this discretion is that the parcels exchanged must be approximately equal in value. *See* 16 U.S.C. § 459b–1(c).[13] Moreover, the Act's legislative history indicates that Congress intended to leave land exchanges in the Secretary's exclusive control. As noted above, the Senate Report on the exchange provision predicates all exchanges on the Secretary's willingness to enter into the transaction. *See supra* p. 1007.[14]

Given that exchange decisions are committed to the Secretary's discretion, this court is "without power" to subject such a decision to judicial review. *See* 5 U.S.C. § 701(a)(2); *see also Bronker v. Morton*, 473 F.2d 790, 797 (9th Cir.1973) (holding Secretary of Interior's decision regarding disposition of federal land not subject to judicial review).[15]

■ Even assuming, however, that judicial review is appropriate, the Secretary's decision does not appear to be arbitrary and capricious.[16] The administrative record and the testimony offered at trial indicate that the Secretary gave thorough consideration to the factors that properly bear on an exchange decision.

As noted above, the Seashore's LAP sets forth three administrative determinations that must be made before the Secretary enters an exchange: "(1) The properties must be approximately equal in fair market values; (2) there must be seashore property which the Secretary is willing to exchange; and (3) The Secretary must deem the property being acquired more important for the seashore than that being exchanged." A.R. at 109. Given that the parties have agreed that equality of value is not an issue in this case, the question becomes whether the Secretary's determinations on the second and third factors were arbitrary and capricious.

Beginning with Secretary Olsen's letter of June 9, 1980, defendants consistently have taken the position that they are unwilling to enter into an exchange with plaintiffs.[17] Plaintiffs make two arguments in an attempt to escape this fact. First, they contend that defendants should be estopped from claiming that they are not willing to enter into an exchange because defendants assured plaintiffs in 1978 that an exchange would be arranged. Plaintiffs contend that they purchased the cottage in reliance on these assurances.

---

**13.** The parties have agreed that the values of the two parcels are not at issue in this case.

**14.** Plaintiffs attempt to discount the significance of whether the Secretary was "willing" to enter the transaction by arguing that Congress was concerned only with the availability of federal land. That is, plaintiffs contend that the Secretary should be "willing" to enter into an exchange whenever federal land is "available" for exchange. This interpretation is contrary to the plain language of the Senate Report and to the Act's primary purpose of preserving the Seashore.

**15.** A determination that the Secretary's decision in this case is not subject to judicial review does not mean that all exchange decisions are exempt from review. For example, if the Secre-

tary violated the clear statutory mandate that the parcels be equal in value, *see* 16 U.S.C. § 459b–1(c), judicial review would be available. *See* Saferstein, "Nonreviewability: A Functional Analysis of 'Committed to Agency Discretion.'" 82 Harv.L.Rev. 367, 372 (1968).

**16.** A recent First Circuit decision noted that if a statute provides broad discretion to an administrative agency, it is unlikely that a decision by the agency will be overturned by a court. *See Dugan v. Ramsay*, at 195; *see also* Saferstein, *supra* n. 15 at 381.

**17.** This court rejects plaintiffs' argument that the question of the Secretary's willingness to enter into an exchange is nothing more than a question of the availability of federal land. *See supra* note 14.

Second, plaintiffs argue that the Secretary's willingness can be inferred from the fact that, prior to the adoption of the new LAP, the Seashore entered into property exchanges in situations comparable to the instant case.

■ It is clear that, in 1978, Mr. Killian assured plaintiffs that the Seashore would exchange federal land for the cottage in question.[18] Plaintiffs, however, were not entitled to rely on Killian's assurances. It is settled law that the government is not bound by the good faith statements of an employee acting beyond the scope of his authority. *See Urban Data Systems v. United States,* 699 F.2d 1147, 1153–54 (Fed.Cir.1983); *DeVilbiss v. Small Business Admin.,* 661 F.2d 716 (8th Cir.1981); *United States v. Tropeano,* 476 F.2d 586, 588 (1st Cir.1973).[19] As the Supreme Court has stated,

> anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

Here, plaintiffs knew that Mr. Killian did not have authority to bind the government. On cross examination, Ms. Greenwald admitted that she understood that Mr. Killian could not authorize the exchange of government land. Tr. 59–60. Thus, the plaintiffs' first argument must be rejected.

■ Plaintiffs' second argument is also faulty. In pointing to exchanges that occurred prior to 1980, plaintiffs ignore the fact that, since then, the Seashore adopted a new land acquisition policy. In adopting the policy, the Secretary complied with the notice requirements of the APA. *See supra* p. 1006. Given these facts, the Seashore certainly cannot be bound by an abandoned, prior policy. *Cf. Pacific Gas and Elec. Co. v. Federal Power Comm'n,* 506 F.2d 33, 38 (D.C.Cir.1974) (indicating that the purpose of a general policy statement is to announce an agency's "tentative intentions" as to future action).

■ The third factor to be considered by the Secretary is the relative importance of the two parcels being exchanged. According to Superintendent Olsen, plaintiffs' property was of minimal value to the Seashore at the time of the request because erosion threatened "imminent loss of the land and structure ...." A.R. at 234.

Plaintiffs put forth three arguments in an effort to demonstrate the importance of their property to the Seashore. First, they contend that their property is important because it contains a pre-1959 dwelling. Second, plaintiffs argue that federal agents must use the Greenwalds' property to gain access to other areas of the Seashore. Third, plaintiffs state that removal of their cottage would reduce human traffic in the area, thereby, reducing the rate of erosion.

These arguments are unpersuasive. First, there is nothing in the Cape Cod National Seashore Act that indicates that pre-1959 dwellings are entitled to special consideration in exchange decisions. *See supra* p. 1007. Even if some degree of special consideration were appropriate, a pre-1959 dwelling is of little value to the Seashore if it is threatened by erosion. Second, as a matter of fact, the Greenwald property is not necessary to allow federal agents access to other parts of the Seashore. Even adopting the testimony of plaintiffs' own expert, it appears that there is beach between plaintiffs' property line and the mean high water mark that can be

---

18. To the extent that plaintiffs relied on Superintendent Hadley's letter of October 12, 1978, that reliance was misplaced. Hadley's letter merely expressed a willingness to enter into exchange negotiations. It contained no assurance that an exchange would occur.

19. There is no evidence of affirmative misconduct on the part of Mr. Killian in the instant case. *See United States v. Wharton,* 514 F.2d 406 (9th Cir.1975). Even in a situation involving affirmative misconduct by a government agent, the remedy of specific performance sought by plaintiffs is rarely available against the federal government. *Compare id. with Saulque v. United States,* 663 F.2d 968 (9th Cir. 1981).

used for access purposes.[20] Third, even assuming that a reduction in human traffic would reduce erosion, there is nothing in the record to indicate that the life of the Greenwald property would be significantly extended or that its value to the Seashore would be significantly increased.[21]

Upon review of the entire record, it appears that the Secretary gave thorough consideration to the appropriate factors in denying the plaintiffs' request for an exchange. The Secretary's decision, therefore, was not arbitrary and capricious.

For all the above reasons, judgment will be entered for defendants.[22]

An order will ISSUE.

---

**20.** In addition, Superintendent Olsen testified that from August 1981, until December 1982, federal agents managed to fulfill their duties despite a directive that the beach in front of the Greenwald property be crossed only in emergencies.

**21.** Plaintiffs cite *Drakes Bay Land Co. v. United States,* 424 F.2d 574 (Ct.Cl.1970), a case dealing with the Point Reyes National Seashore, in support of their position. There, defendant took various actions to prevent plaintiffs from developing land within the National Seashore. At the same time, defendant refused to acquire plaintiffs' land by exchange or purchase. The court held that defendant's actions constituted a taking.

*Drakes Bay* is distinguishable from the instant case on several grounds. The most important distinction is that the legislative history of the Point Reyes Act clearly directed the Department of Interior to acquire all land within the seashore as quickly as possible. *See id.* at 584. In the instant case, the Secretary did not ignore a clear Congressional directive.

**22.** As noted above, certain government officials assured plaintiffs that defendants would be willing to enter into an exchange transaction. *See supra* p. 1004. This court feels that the plaintiffs were misled to their disadvantage. If this were a case of first impression, this court would hold that the Secretary's decision was arbitrary and capricious because it failed to honor the government's assurances. As explained *supra* p. 1008–1009, however, it is settled law that the government cannot be bound by the representations of its agents, acting beyond their authority.